IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SUZANNNE PARISIEN, | ) | |
| | ) | No. 40267-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EIGHTY SOUTH JACKSON | ) | |
| CONDOMINIUNM ASSOCIATION, a | ) | UNPUBLISHED OPINION |
| Washington nonprofit; KARLI NEALE, | ) | |
| an individual; RENEE PAQUET, an | ) | |
| individual RYAN CONROY, an | ) | |
| individual; LESLIE HAYNES, an | ) | |
| individual. | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. — A cascade of water flooding Suzanne Parisien's penthouse condominium unit overlooking Puget Sound launched litigation by Parisien against her seller Manuel Lucio, the condominium association Eighty South Jackson Street Condominium Association, board members of the condominium association, managers of the condominium building, and Parisien's real estate broker Stephanie Susen. The superior court dismissed on summary judgment all claims asserted against the condominium association, association board members, and the real estate broker.

A trial against Lucio resulted in a defense verdict. We reverse in part and affirm in part the superior court's summary judgment rulings on claims against the condominium association, the board members, and the real estate broker. We affirm the verdict in favor of seller Lucio.

FACTS

This lawsuit concerns water intrusion through the fourth and fifth floor roofs into unit 405 of the Eighty South Jackson Street condominium building in downtown Seattle. The owner of unit 405, Suzanne Parisien, sues the former owner, Manuel Lucio, who sold the unit to her; Eighty South Jackson Condominium Association, the condominium association for the condominium owners in the building; individual board members of the condominium association; and Stephanie Susen, Parisien's real estate broker. We purloin the facts from pleadings filed in support of and in opposition to summary judgment motions and from trial testimony. We generally view the evidence in a radiance beneficial to appellant Suzanne Parisien, although we mention facts to the contrary. The numerous parties and the many claims and defenses of the parties prolong this opinion.

The historic Eighty South Jackson Street building, located in Pioneer Square, houses 27 individually owned condominium units. The condominium building was built in 1900. In 1989, condominium owners birthed a condominium association and recorded a Declaration and Covenants, Conditions, Restrictions and Reservations (the Declaration of Covenants).

2



The 1989 Declaration of Covenants reads that all condominium owners belong to the condominium association. Article 9.2.1. A volunteer board of directors manages the association. Article 9.5.1. The association may establish bylaws, which along with the covenants, govern the administration of the association. Article 9.5.1

We perform the mundane task of summarizing the Declaration covenants critical to resolving the claims on appeal against Eighty South Jackson Street Condominium Association and its board members. Section 1.9 defines words commonly used within the declaration. Paragraph 1.9.26 defines "Property" to include the building and its improvements. Article 6 of the declaration delineates the building's common areas to include roofs and pipes.

Article 10 of the declaration outlines the authority and duties of the board of directors, which include a duty to pay from a common fund Common Area maintenance

and repairs necessary or proper for the operation of the Common Area. Meanwhile, Article 11 imposes on individual condominium owners the duty to repair and maintain the interior of their respective condominium units at their expense.

The Eighty South Jackson Condominium Association covenants require the board of directors to procure insurance policies sufficient to cover common areas of the building. Article 13.1 declares in part that the board shall maintain property insurance covering all general common and limited common areas equal to the full insurable current replacement value of those areas and each apartment equal to its full insurable replacement value. The board must also maintain at least one million dollars in general comprehensive liability insurance covering the Board, the Association, its owners, and manager against liability to apartment owners for property damage incident to the ownership or use of common and limited common areas.

Article 14 of the declaration addresses damage to property and its reconstruction. Portions of the article establish the process the board must follow to assess damage and recommend repair and restoration work.

The covenants limit the liability of the board of directors and board members. They are not liable for, among other things, injury or damage to property caused by water or rain "which may lead or flow from outside or from any parts of the buildings . . . or from any other places." Clerk's Papers (CP) at 1767. They also are not personally liable to any owner for any damage claimed on account of "any act, omission, error, or

negligence (except gross negligent)" – unless covered by insurance – as long as the board member acts in good faith and without willful or intentional misconduct. CP at 1767.

Eighty South Jackson Condominium Association hired a professional building manager, Raymond Waite, and his company, Tiger Management, to maintain the condominium building. On occasion, the condominium association hired contractors to repair common areas of the condominium building. The association periodically hired Architectural Building Inspection (ABI) to prepare reserve studies in 1998, 2005, and 2019. The 1998 reserve study noted that sections of the condominium building roof lacked overflow scuppers in violation of current building code requirements. The study declared:

> The roof sections (parapet wall and roof edge) enclosures at the penthouse and south two-thirds building sections do not have overflow scuppers. (These are drain openings through the wall or raised overflow inlets with a separate drainage system, and required by current code.) The existing drain inlet could become clogged, which would result in water filling the roof enclosure. Clogging can be caused by debris accumulation on the roof, but it can also be caused by ice dams during freezing weather. This could cause serious damage to the building, and it would be good, as a preventative step, to install overflow scuppers.

CP at 1327. ABI also reported low areas in the roof where water was "ponding" rather than draining. The ponding violated the building code and rendered the roof vulnerable to leaking.

Eighty South Jackson building's roofing system consists of a fourth floor roof and a fifth floor roof, both of which are flat and compartmentalized:

5



In 2007, unit 405 at Eighty South Jackson Street was owned by David Perry, who installed, at his expense, a heating, ventilation, and air conditioning system. Perry garnered, from the City of Seattle Department of Planning and Development, a permit for a ceiling mounted ductless air-conditioning unit. Perry never provided the condominium association with any records about the system. The installed HVAC unit sits on the condominium's roof in a common area adjacent to unit 405. A foam insulated refrigeration line runs from the HVAC unit to condominium unit 405's wall, to the unit's

upper roof area, where it enters unit 405. The system and its insulated pipe serve only

unit 405.





In 2010, Eighty South Jackson Condominium Association replaced a portion of

the condominium building's roof. The evidence does not identify the location of the

portion replaced or the size of the replacement. The contractor, Mono Rooftop Solutions,

provided a 15-year warranty that required the company to repair any leaks due to membrane failure. The warranty excluded water infiltration from "vent/fan/exhaust/mechanical equipment." CP at 1664. On at least one occasion, Mono Rooftop Solutions performed repairs above unit 405. No evidence suggests that the replacement of the roof resolved the previous problems of ponding or added overflow scuppers.

Eighty South Jackson Condominium Association Board meeting minutes document continuing leaks of the building roof. In multiple meetings, the condominium association discussed the need to replace the entire roof. Minutes of one meeting read that "[t]he scupper box for the gutter system needs to be enlarged so that the gutter can effectively move water off the building roofline in major storms." CP at 1342. In testimony in this litigation, condominium association manager Raymond Waite confirmed continuing leaking, especially in the upper units such as unit 405, and frequent discussion of replacing the roof.

According to Suzanne Parisien's homeowner association expert, Eighty South Jackson Condominium Association's haphazard approach of maintaining the roof fell below the standard of care of a condominium association. The association also acted incompetently when failing to periodically check whether scuppers became clogged.

On November 30, 2017, condominium building manager Raymond Waite retained American Leak Detection to respond to a leak in unit 402, three doors down from the unit later purchased by Suzanne Parisien. The detection company recommended a full

replacement of the fourth floor roof because the roof showed signs of wear, tear, and aging. Building manager Waite concurred with this assessment of the need to replace the roof. The condominium association did not heed the recommendation.

During his trial testimony, Manuel Lucio agreed that he knew of leaks into units 401 and 402 before he sold unit 405 to Suzanne Parisien. Buckets were used to capture water. Intruding water stained the carpet in front of units 401 and 402. Lucio knew that the leaks necessitated a roofer to solve the problem. Presumably in the role as a board member, Lucio, prompted by the leaks, asked manager Raymond Waite as to the age of the roof. Waite responded that he did not know the age.

Before selling unit 405 to Suzanne Parisien, Manuel Lucio knew of the pooling of standing water on the roof above his unit 405 living room. Lucio considered the pool detrimental. Raymond Waite then advised Lucio that the lack of drainage above his condominium could not be fixed without installing a new roof. Lucio did not later volunteer any of this information to Suzanne Parisien. According to Manuel Lucio, he also did not later disclose to Suzanne Parisien an active leak in a unit near unit 405. Lucio knew, however, that leaks in the common areas would financially affect Parisien because the roof is a common area.

In 2019, Suzanne Parisien wished to downsize her home and eliminate her commute to work, so she looked for a downtown Seattle condominium. On February 7, 2019, Parisien's real estate broker, Stephanie Susen, showed Parisien unit 402 in the Eighty South Jackson Street condominium building. Susen then gave Parisien the seller

disclosure statement for unit 402 and the condominium association's declarations. The seller disclosure statement for unit 402 disclosed that the roof had leaked within the past five years. Susen also forwarded to Parisien the thread of email communications, between Susen and the real estate agent for the owner of unit 402, about leaks in the condominium. Suzanne Parisien forwarded the seller disclosure statement for unit 402 and Declaration of Covenants to attorney Joshua Rosenstein to review. Rosenstein suggested, among other things, that Parisien garner a copy of Eighty South Jackson Condominium Association's reserve study.

Stephanie Susen obtained the condominium association's 1998 reserve study from the unit 402 seller's agent and emailed the study to Parisien on February 15, 2019. The accompanying email read:

> Hi Sue,
> [T]he listing agent for #402 sent over the attached Reserve Analysis. Feel free to review, however it is from 1998, so not sure how applicable/helpful it will be in assessing current building status.

CP at 2343. Suzanne Parisien does not recall reviewing the email or reserve study. Susen and Parisien never discussed the reserve study. Susen did not warn Parisien of any risks about the lack of a current reserve study.

While Suzanne Parisien pondered whether to purchase unit 402, Stephanie Susen notified Parisien that unit 405 of the Eighty South Jackson condominium building, a two-story penthouse unit, would soon be listed for sale by Manuel Lucio. Parisien viewed unit 405, adjudged it stunning, and, on February 16, 2019, made an offer to purchase.

On February 17, 2019, Manuel Lucio completed a Form 17 seller's disclosure statement for the property conditions related to unit 405. The Northwest Multiple Listing Service labeled its preprinted form of the seller disclosure "Form 17," which led to the Washington real estate industry adopting the nomenclature. Form 17 asked Manuel Lucio to disclose whether the roof had leaked in the last five years. Lucio answered "yes" and interlineated the words "HOA FIXED IT." CP at 4223. Lucio added that he did not know if flooding, standing water, or drainage problems impacted the condominium unit.

On February 17, 2019, Manuel Lucio and Suzanne Parisien signed a condominium purchase and sale agreement. At the time, Lucio served as the Eighty South Jackson Condominium Association Board President. One paragraph in the agreement declared that no broker made representations about the property or agreed to independently investigate anything about the property and that the buyer was advised to exercise due diligence to inspect the property for defects:

> x. Property Condition Disclaimer. Buyer and Seller agree, that except as provided in this Agreement, all representations and Information regarding the Property and the transaction are solely from the Seller or Buyer, and not from any Broker. The parties acknowledge that the Brokers are not responsible for assuring that the parties perform their obligations under this Agreement and that none of the Brokers have agreed to independently investigate or confirm any matter related to this transaction except as stated in this Agreement, or in a separate writing signed by such Broker. In addition, Brokers do not guarantee the value, quality or condition at the Property and some properties may contain building materials, including siding, roofing, ceiling, insulation, electrical, and plumbing, that have been the subject of lawsuits and/or governmental

11

inquiry because of possible defects or health hazards. Some properties may have other defects arising after construction, such as drainage, leakage, pest, rot and mold problems. Brokers do not have the expertise to identify or assess defective products, materials, or conditions. Buyer is urged to use due diligence to inspect the Property to Buyer's satisfaction and to retain inspectors qualified to identify the presence of defective materials and evaluate the condition of the Property as there may be defects that only may be revealed by careful inspection. Buyer is advised to investigate whether there is a sufficient water supply to meet Buyer's needs. Buyer is advised to investigate the cost of insurance for the Property, including, but not limited to homeowners, flood, earthquake, landslide, and other available coverage. Buyer and Seller acknowledge that home protection plans may be available which may provide additional protection and benefit to Buyer and Seller. Brokers may assist the parties with locating and selecting third party service providers, such as inspectors or contractors, but Brokers cannot guarantee or be responsible for the services provided by those third parties. The parties shall exercise their own judgment and due diligence regarding third-party service providers.

CP at 105 (boldface omitted).

The purchase and sale agreement between Suzanne Parisien and Manuel Lucio included an inspection contingency that afforded Parisien a right to inspect the property. The addendum conditioned the closing of the sale on Parisien's "subjective satisfaction with inspection of the Property and the improvements on the Property." CP at 4047.

Broker Stephanie Susen also forwarded to Suzanne Parisien communications between Susen and the listing broker about unit 405 leaks. Parisien admits that she knew of minor leaks into units 402 and 405 before her purchase of the latter unit. Her condominium association expert comments that, from a practical perspective, unit owners should not climb onto the condominium building roof to assess the condition of the roof

12

and appliances on the roof. No one suggested to Parisien that she review the condition of the roofs. Parisien did not know how to access the fifth floor roof.

The Washington Condominium Act demands that the seller of a condominium unit deliver a resale certificate to the buyer. The act requires that the condominium association prepare the certificate for the seller.

Eighty South Jackson Street Condominium Association delegated preparation of its resale certificates to outside managers and the individual homeowners selling their condominiums. In 2019, Raymond Waite managed the association. The association took no steps to assess Waite's qualification to prepare resale certificates. Waite lacked the complete books and records of the association, lacked training or experience in preparing resale certificates, and utilized forms remaining from earlier sales. The association denies knowledge of Waite's preparation of certificates and knew not who Waite directed to sign the certificates.

Raymond Waite delegated preparation of resale certificates to Eighty South Jackson Street Condominium Association bookkeeper, Gigit Koh. Waite took no action to determine Koh's qualifications to prepare the certificates. Waite provided Koh no training or information to prepare the certificates. In a deposition, Waite admitted that delegating preparation of the certificates to Koh made no sense.

Gigit Koh believed Raymond Waite tasked her with preparing resale certificates because, as a bookkeeper, she knew the amount in the reserve account kept by the condominium association. Koh lacked access to information about past reserve studies

and the condition of the condominium building. She never examined the condition of any condominium units or the building as a whole.

Gigit Koh, on behalf of the condominium association, signed the resale certificate for Suzanne Parisien's purchase of unit 405. Manuel Lucio signed as the selling unit owner. Both Koh and Lucio attested that the resale certificate was true and correct to the best of their knowledge and belief under oath and penalty of perjury. The form contemplated that Lucio would forward it to Parisien. After Lucio and Parisien reached an agreement, Lucio sent Parisien the condominium resale certificate.

The resale certificate delivered to Suzanne Parisien denied any code violations, stated that the current monthly assessment for unit 405 was $597.81, declared that the condominium association's reserve account balance was $183,162.31, and asserted no anticipation of repair or replacement costs in excess of five percent of the condominium association's annual budget. The certificate contained a blank for the purchaser's initials on each page along with a formal acknowledgement of receipt. Suzanne Parisien did not ask her real estate broker or her attorney to investigate the accuracy of the certificate or the seller's disclosure statement.

Some evidence shows comments in the resale certificate to be false. The roof drainage scupper was undersized and lacked overflow protection required by the building code. The inadequate size of the scupper rendered the scupper susceptible to blockage and overflow of water. Even with properly sized scuppers, overflow protection is required because the scupper will typically become blocked by debris

over time. Plant matter, windblown garbage, dead birds, or other random detritus can become lodged in the scupper opening and cause a blockage. Ice dams during freezing may also plug the scupper. The current building code anticipates blockage such that the code demands overflows in the roof drainage system. The absence of overflow protection creates the risk of scupper blockage resulting in water intrusion.

The resale certificate failed to warn Suzanne Parisien about the lack of a current reserve study. Some evidence demonstrates that, at the time of Parisien's purchase, Eighty South Jackson Street Condominium Association's reserve account was grossly inadequate and underfunded. An updated reserve study, performed at Parisien's request soon after purchasing her unit but before her unit flooded, revealed that the reserve account balance should have been $1,180,000, one million more than the cash on hand. This post-purchase, pre-flood reserve study employed a visual inspection and actuarial cost estimates. The condominium association had deferred maintenance, repair, and replacement of common areas. A comprehensive evaluation after the 2019 water intrusions in unit 405 revealed that repairs would cost between $9.75 and $19.85 million.

Suzanne Parisien testified that she relied on the resale certificate in deciding to proceed with the purchase of her unit from Lucio. If the certificate had disclosed building code violations and warned about the lack of a current reserve study and associated risks, she would not have purchased the unit.

Stephanie Susen did not recognize or notify Suzanne Parisien that the resale

certificate came on an outdated form. Because of its staleness, the certificate omitted a

warning required by former RCW 64.34.425(1)(s) (2011):

> This association does not have a current reserve study. The lack of a current reserve study poses certain risks to you, the purchaser. Insufficient reserves may, under some circumstances, require you to pay on demand as a special assessment your share of common expenses for the cost of major maintenance, repair, or replacement of a common element.

CP at 2158. Susen never warned Parisien of the risk attended to the absence of a reserve

study.

Real estate broker Stephanie Susen never agreed to conduct an independent

inspection of unit 405 or the condominium building. Susen never agreed to investigate

the accuracy of information in the reserve study or the resale certificate and never

promised to review the condominium association's financial situation. Suzanne Parisien

never asked Susen to scrutinize the condition of the condominium unit, the condominium

building, or the condominium association finances.

Stephanie Susen did not review or discuss the condominium documents with

Suzanne Parisien, but she recommended that Parisien review them and obtain an

inspection. Parisien reviewed on her own the resale certificate and the seller disclosure

statements for units 402 and 405. She noted that the disclosure statements for both units

revealed a past roof leak. This information did not alarm her because the statements

added that the association had repaired the leaks. She also noted that the resale certificate

disclosed no health or building code violations and no anticipated repair or replacement costs in excess of five percent of the annual budget.

Suzanne Parisien hired an inspector to examine unit 405. The inspector saw no sign of a water leak in the unit. He did not inspect the roof. Parisien did not ask the inspector to examine the roof and did not provide him Manuel Lucio's Form 17 disclosure.

After the inspection, Suzanne Parisien completed her purchase of unit 405. She occupied the unit beginning in May 2019. The condominium association then assessed unit owners $846.60 each month. From her habitation through July 2020, she experienced some water leaks.

In October 2019, the Board voted to commission a reserve study, which was completed in April 2020. The architectural firm ABI prepared the 2020 reserve study for the Eighty South Jackson building. The study read:

> In terms of the anticipated required capital component replacement, the Association is in an excellent position as long as (1) maintenance, repair and replacement are similar to what has been done thus far, and (2) the assessment amounts are properly maintained and funded.
> . . . .
> In general, the property condition is excellent to very good.
> . . . .
> Relative to other condominiums we have checked, I found this building to be very much above average quality.

CP at 1678 (boldface omitted). The study warned that the capital assessment for the condominium association was inadequate.

17

On July 6, 2020, Suzanne Parisien filed suit against Eighty South Jackson Condominium Association. She alleged negligence and sought declaratory relief that the association must conduct repairs because of leaks in unit 405 in 2019. Parisien did not serve the complaint on the condominium association. In the summer and fall of 2020, both Parisien and the association conducted repairs to unit 405. The condominium association paid for the repairs. The work ended in late October 2020.

In early November 2020, Suzanne Parisien intended to dismiss the lawsuit complaint she filed on July 6 against Eighty South Jackson Condominium Association and its board members. Her intention dissolved when, on November 3, 2020, rainwater flowed from the fifth floor roof into unit 405.

On November 3, Georgianna Chamberlain, who resided in unit 205, below Parisien's unit 405, noticed water rushing past her window. She stepped outside and found a large amount of water tumbling from the top of the roof and gutter on the alley side of the building. She predicted that unit 405 must be suffering from the water fall.

According to an architect hired by Parisien, James Riley, a deteriorated piece of HVAC insulation had detached from Parisien's rooftop HVAC unit and clogged an opening under a ventilation duct located near the hood of Parisien's HVAC unit.





With the scupper clogged, rainwater collected on the roof, puddled around the HVAC hood, cascaded through an improper seal in the HVAC hood, and flooded unit 405. According to expert Riley, the failure to bring the roof scupper and the associated overflow system to code caused the November 3 flood in unit 405.





Suzanne Parisien's expert architect, James Riley, opined, during the course of the lawsuit, that the building code anticipates blockages on the roof. For that reason, the code requires overflow systems. The condominium association should have anticipated, because of its inevitability, that ice, plant detritus, windblown garbage, dead birds, or other random garbage will block a scupper. The expert added that for practical reasons, a

condominium association should not expect a unit owner to access the roof to periodically inspect HVAC pipes and insulation directed to the owner's unit.

Eighty South Jackson Condominium Association insists that an inadequate scupper did not cause the leak and flowage into unit 405. The association contends that the unit 405 flooded because its HVAC system's pipe insulation broke.

The November 3, 2020 water surge into unit 405 caused substantial damage on both floors of the condominium unit. The harm extended to hardwood floors, walls, framing, drywall, insulation, baseboards, appliances, doors, lighting, range, dishwasher, tile, refrigerator, smoke detector, countertops, cabinetry, heat pump, speakers, switches, closet shelves, couches, a dining room cabinet and chairs, an armoire, and rugs. The water cascade also spoiled Parisien's personal property.

Eighty South Jackson Condominium Association new property manager, CWD Group, instructed Suzanne Parisien to move from unit 405. Within a day, Parisien moved from unit 405 and into a hotel because of the water damage. In a summary judgment declaration, Parisien avers that the association told her it would pay for all repairs to her condominium unit:

> After the November 3, 2020, loss, I was told by the association and its then building manager CWD . . . that they would take care of everything, that they would pay for all the repairs, and that I must vacate the property. I was given less than one day's notice to vacate, which I did in reliance on these promises.

CP at 92. The declaration does not identify the representative of the building manager or of the association who uttered the promise or promises, the date of the promises, or the

location where the representatives gave the promises. The declaration does not quote verbatim the words spoken that Parisien deemed to be a promise or promises.

Suzanne Parisien writes in her brief that the association's CR 30(b)(6) deposition designee, Rene Paquet, confirmed the association promised to repair unit 405. The deposition citation given for this assertion includes only testimony that the association hired a contractor. Parisien correctly writes in her brief that Stephen Fjelstad, the condominium association's general counsel, agreed in his deposition that the condominium association bears the responsibility to repair Parisien's condominium.

ServPro, a water remediation contractor hired by the condominium association, sought to dry the condominium, and it removed damp drywall, flooring, interior finishes, kitchen appliances, and large sections of ceiling and floors on both levels of the home. ServPro disconnected water delivery and gas service to the unit.

Property manager, CWD Group, with the approval of the condominium association, procured BluSky to provide a repair estimate to restore Suzanne Parisien's condominium. At the direction of CWD Group, The Contents Specialists packed all salvageable contents and personal effects of Parisien and placed the personalty in a storage facility. Parisien lacks access to the facility and has yet to retrieve the effects. On December 2, 2020, BluSky tendered a bid to the condominium association to repair the damages to unit 405 caused by the November 3 flood.

On March 3, 2021, the board members of the Eighty South Jackson Condominium Association voted to repair the November 3, 2020, damage to unit 405 and the building

roof. The board approved a special assessment of $308,226 to pay for the uninsured cost of those repairs. The board collected the assessment from unit owners. Suzanne Parisien paid $17,000 as her portion of the assessment.

Attorney Douglas Hoffman represented Eighty South Jackson Condominium Association during discussions in early 2021 with Suzanne Parisien and her attorney Shannon McKeon about repairing unit 405 and reaching an understanding as to payment for the repairs. On June 26, 2021, attorney Hoffman, authorized by the association to do so, notified attorney McKeon that the condominium association had completed the special assessment and was ready to begin repairing unit 405. According to Hoffman, McKeon responded by insisting on new conditions to the repairs. The parties thereafter never reached an agreement. Therefore, the condominium association signed no contract with a contractor.

The condominium association collected the assessment, selected contractors, directed Suzanne Parisien to vacate unit 405, removed her possessions, and demolished her unit. Parisien vacated her condominium. Later, however, the association's contractor, Blue Sky Construction, did not restore, and the association declined to pay to restore, unit 405.

On July 15, 2021, Eighty South Jackson Condominium Association learned that Dave Perry, former owner of unit 405, installed the HVAC unit on the roof leading to the condominium. With this knowledge, the condominium association denied any responsibility to pay for repairs to unit 405. According to association counsel, Douglas

23

Hoffman, the association earlier agreed to assume responsibility for the repairs on the honest and mistaken belief that it had installed the HVAC system.

In August 2021, Amento Group, Inc., prepared for Eighty South Jackson Condominium Association a comprehensive review of the entirety of the condominium building. Armento reported that the building needed $1.21 million to $3.05 million worth of immediate repairs and $9.75 and $19.85 million for a complete remediation. The condominium association amended its resale certificates to disclose to prospective purchasers that more than $11 million would be needed for repairs.

Beginning in December 2021, repairs were performed in unit 405 at Suzanne Parisien's expense. During trial testimony on the claim against Manuel Lucio, Parisien testified that she cannot live in unit 405 anymore. The repairs, costing $52,868, did not return the condominium to its condition at the time of her purchase.

As of May 2022, Suzanne Parisien had moved four times. In May 2022, Parisien lived in a studio apartment above a friend's garage. She continues to pay utility costs, the mortgage, and condominium assessments at unit 405 in addition to rent and utilities at her apartment. Association assessments rose to $1,224.25 each month in 2021 and $2,078.74 per month in 2022. At the time of trial, Parisien rented unit 405 at $4,995 a month.

PROCEDURE

Suzanne Parisien sued Eighty South Jackson Condominium Association and its board members, Karlie Neale, Renee Paquet, Ryan Conroy, Leslie Haynes, and Manuel Lucio for breach of covenants, breach of contract, breach of fiduciary duties, negligent

24

misrepresentation, and declaratory judgment. The claims focus on representations in the resale certificate, the alleged failure to maintain, repair, and replace the roof and drainage system, and the failure to fully repair the water damage to unit 405 that occurred on November 3, 2020.

In her complaint, Suzanne Parisien did not plead intentional misconduct, gross negligence, or self-dealing against the condominium association or its board members, nor has she asserted any intentional or knowing violations of the law. Parisien did not plead equitable estoppel. In her complaint's outline of the facts, she does not mention any promise, let alone breach of a promise, by the condominium association, after the November 2020 flood, to pay for the repairs. Parisien requested monetary relief in the form of special and general damages, attorney fees and costs, and declaratory relief against the association.

Suzanne Parisien also sued Manuel Lucio as the seller of the condominium for violation of RCW 64.06.020, breach of the purchase and sale agreement, negligent and intentional misrepresentation found in the seller disclosure statement, concealment, deceit, and rescission. Parisien sued property manager Raymond Waite and his property management company, Tiger Management, LLC d/b/a Pioneer Square Condominium Management, for negligence and negligent misrepresentation. Finally, she sued Stephanie Susen and her brokerage company, the Landover Corporation, for negligence, negligent misrepresentation, breach of statutory duties of care, and violation of the Consumer Protection Act (CPA).

Eighty South Jackson Condominium Association tendered Suzanne Parisien's claims to State National Insurance Company, the condominium association's commercial general liability (CGL) insurer, who initially accepted coverage under a reservation of rights. State National apparently later denied coverage on the basis that its policy expired on September 13, 2020, and thus its policy did not apply to the November 3, 2020, leak. The condominium association also tendered Suzanne Parisien's suit to its directors' and officers' insurer, Travelers, who accepted coverage to defend the board members. Nevertheless, the Travelers policy does not cover property damage.

The condominium association later tendered coverage for the November 3, 2020, leak to its replacement CGL insurance carriers, Aspen Specialty Insurance Company and James River Insurance Company. Both declined coverage due to the leak arising from broken insulation related to unit 405's HVAC system rather than deficiencies in the roof. In one letter to an insurer, the condominium association commented that the "damage occurred when a piece of refrigerant-line insulation protecting a roof component (a part of the HVAC system) broke off and clogged one of the scuppers serving the roof." CP at 1135.

According to the condominium association, the association learned that Suzanne Parisien's insurance carrier spent over $145,000 remediating the damage to unit 405 and providing alternate living arrangements for Parisien. The condominium association also asserts that Parisien demanded the association's property managers to return her keys and barred board members and the association's agents from entering her unit.

26

The association adds that Parisien objected to its hiring contractors to evaluate repairs to unit 405 and ultimately the association did not hire contractors to repair the unit.

Suzanne Parisien denies that she barred condominium association board members and agents from access to unit 405. Parisien's counsel sent a letter to the condominium association's attorney declaring: "[We] are happy to discuss an inspection at some future date." CP at 1652. The condominium association's designated corporate representative for a corporation deposition and its general counsel confirmed under oath that the condominium association was responsible for repairing Parisien's unit.

In the course of this lawsuit, each party hired experts on the subject matter of a real estate broker's duties toward a client. Stephanie Susen's expert, Douglas Tingvall, a lawyer and former real estate broker, filed a declaration in support of Susen's summary judgment motion. The declaration read, in part, that it is not a broker's standard practice to advise a client about the contents of a reserve study, the requirements for reserve study disclosures, or the risks of inadequate reserves, or to investigate or confirm the accuracy of information in a resale certificate:

> As to plaintiff's allegation that Ms. Susen should have advised plaintiff regarding information contained in the reserve study, it is not standard practice for a real estate broker to do so. It is beyond the expertise of a Washington real estate broker to inform the client about the requirements for disclosures relating to reserve studies or about the risks of inadequate reserves. Notably, prior to making an offer on the Property, plaintiff sought advice from an attorney and was advised to look into the financial condition of the Property.
> Similarly, it is not standard practice for a Washington real estate broker to investigate or confirm the accuracy or completeness of

information in a resale certificate and doing so is outside the expertise of a real estate broker. Real estate brokers are taught not to undertake an investigation or review of legal documents such as the resale certificate, title report, the Form 17, or closing documents, as doing so could create exposure to real estate brokers for the unauthorized practice of law.

CP at 2129-30.

In her appeal brief, Suzanne Parisien writes that Stephanie Susen's expert Doug Tingvall agreed, in a deposition, that water leaking in a neighboring unit in the same condominium building posed a "red flag." The parties and their experts sometimes employed the phrase "red flag," a metaphor for a problem needing attention. We disagree with Parisien's characterization of Tingvall's testimony. Our scrutiny of the deposition informs us that Tingvall only deemed water leaks into the purchased unit to create a red flag. Tingvall testified:

Q. [By Suzanne Parisien's attorney] And so my question, though, for you, sir, is if a broker representing a buyer becomes aware of an active leak in—even it's a different condominium unit than what the buyer is buying, that they have an obligation to report that to their client and let their client decide what they want to do with that information, and failure to do so would be a breach of the standard of care for a Realtor.
Is that your understanding?
MR. GUSTAFSON [Counsel for Stephanie Susen]: Object to the form.
THE WITNESS: Yeah. Now you've asked a completely different question, because you just injected the additional element that the leak affected a different unit than the subject property.
And of course a condominium unit is defined, you know, by its three-dimensional air space, and if the leak or any other defect didn't affect that unit, there's no obligation to disclose that a unit down the hall was affected by a roof leak. It could be a completely different circumstance.

28

And so the definition of the property, for purposes of Form 17, is the unit itself, together with any undivided interest in the common areas and the limited common areas. And if the defects affect a different unit, that's not a required disclosure or red flag.

CP at 3255-56.

Lars Neste, an attorney specializing in real estate law, opined on behalf of Suzanne Parisien as to a real estate broker's standard of care. Neste testified that Stephanie Susen violated the standard of reasonable care and skill. Neste emphasized that Susen gathered a Form 17 disclosure for units 402 and 405 and both forms disclosed recent roof leaks. According to Neste, the Form 17 disclosures constituted a "red flag" that Susen should have raised with Parisien. Because of common problems with water leaks in condominium buildings, Susen should have spoken to Parisien of the need for a thorough inspection.

Lars Neste highlighted that Manuel Lucio supplied Parisien with a resale certificate on a 2005 form. Neste believes that, if Lucio had provided a more current certificate, Parisien would have been properly advised of the risk posed by inadequate reserves. Neste did not specify that Stephanie Susen held a duty of care to inform Parisien of the outdated resale certificate or the dangers of inadequate reserves.

Lars Neste underscored that Stephanie Susen supplied Suzanne Parisien with a 1998 reserve study. According to Neste, the lack of a current reserve study also constituted a "red flag." A broker exercising reasonable care would have warned the buyer of a condominium of the potential risk of later significant special assessments

29

resulting from the possibility of low reserves. Neste recognized that Susen advised Parisien that the outdated reserve study might not be helpful. But, according to Neste, Susen should have gone further and alerted Parisien of a significant risk resulting from the lack of a recent evaluation by a professional of the needed reserves. Neste opines that Susen should have referred Parisien to experts for a current evaluation of the condominium common areas and the condominium association's finances.

Lars Neste, in a declaration, averred:

> A home inspector will often only inspect the unit being sold. An inspection of only the unit would be insufficient where there have been recent roof leaks and there has not been a current reserve study. In that case, a more extensive inspection of the common areas and evaluation of the HOA's finances is [sic] necessary.

CP at 2159.

Makoto Mark Kitabayashi served as Suzanne Parisien's other expert on the standard of care of real estate brokers. Kitabayashi is a real estate broker who has been licensed since 2000. He teaches real estate to agents.

According to Makato Kitabayashi, a real estate broker should recognize an outdated resale certificate form and know that the completion of an updated form would give the buyer more protection. For example, the resale certificate supplied to Suzanne Parisien lacked any requirement that Parisien initial and acknowledge that the condominium association lacked a current reserve study, which missing requirement increased Parisien's risk when purchasing the condominium. According to Kitabayashi, Stephanie Susen should have advised Parisien to investigate the water leaks. Susen

30

should have told Parisien's home inspector about earlier water leaks into unit 402 and unit 405. Susen should have advised Parisien that the outdated reserve study posed risks to Parisien. Susen should have reviewed with Parisien the Form 17 disclosures.

The superior court entered CR 12(b)(6) and summary judgment orders that dismissed all claims against all parties, except Suzanne Parisien's claim against Manuel Lucio as the seller of the condominium. Parisien's claims against Lucio proceeded to a jury trial.

During trial, Manuel Lucio testified to a belief that he lacked a duty to disclose information about the condominium building roof because, according to him, Form 17 only concerned the condition of his unit, not the entire building. One juror asked a question to Manuel Lucio's real estate broker, Thomas Bernard, which the court asked Bernard to answer:

> THE COURT: Next question: "Is it typical for sellers of condo units to disclose material defects from the building's common elements in their Form 17?"
> THE WITNESS: It is not.

Report of Proceedings (RP) at 1530.

We paraphrase or quote the trial court's jury instructions important to Suzanne Parisien's appeal. Jury instruction 8 declared that an owner sells his undivided interest in common areas when the owner sells a condominium unit. Instruction 10 read that a party to a transaction must tell the other party of known matters that he knows are necessary to prevent partial or ambiguously-stated facts from misleading the other party.

31

Jury instruction 13 informed the jury that a seller is not liable for a Form 17 error, inaccuracy, or omission if he did not actually know of it. Jury instruction 15 cumbersomely read in part,

> for a plaintiff to prevail on a negligent misrepresentation based on a defendant's alleged failure to disclose information the defendant was duty-bound to disclose, the plaintiff must prove that the defendant has a disclosure duty regarding the condominium unit and the condominium building and that the defendant did not disclose all information about the condition of the condominium unit and the condominium building.

CP at 4003-04. Jury verdict question 11 asked the jury to answer whether Lucio concealed defects "in the subject property (80 S. Jackson Building Condominium)." CP at 4020.

The superior court rejected Suzanne Parisien's proposed jury instruction No. 17, which would have instructed the jury that Lucio possessed a duty "to disclose material facts and/or defects associated with . . . common elements of the Eighty South Jackson Condominium building." CP at 3915. Lucio objected to the instruction because it included "language about common elements." RP at 1467. The court declined to give the proposed instruction because it contained a blank seller disclosure statement as an attachment and from concern that the jury would focus its attention on the disclosure statement over other exhibits admitted into evidence. The jury returned a verdict for Lucio.

32

We do not know whether the trial court resolved Suzanne Parisien's claims against the property manager Raymond Waite or whether the parties settled those claims. The claims against the property managers are not on appeal.

## LAW & ANALYSIS

Suzanne Parisien appeals the summary dismissal of her claims against Eighty South Jackson Condominium Association, the condominium association's board members, and Stephanie Susen, her real estate agent. She also appeals rulings made during the trial against Manuel Lucio. The multifaceted appeal has eight primary issues, which we resolve as follows:

(1) We affirm the summary judgment dismissal of Suzanne Parisien's claims against Eighty South Jackson Condominium Association and its board members for allegedly maintaining an inadequate reserve account and failing to disclose the lack of a current reserve study.

(2) We affirm the summary judgment dismissal of Suzanne Parisien's claim against the condominium association and its board members for purportedly issuing a false and incomplete resale certificate that failed to warn her about the association's lack of a current reserve study and the risks associated with the lack of a current reserve study.

(3) We reverse the summary judgment dismissal of Suzanne Parisien's claims against the condominium association and its board members for purportedly issuing a false and incomplete resale certificate that mentioned no building code violations.

(4) We reverse the summary judgment dismissal of Suzanne Parisien's claim against the condominium association and its board members for allegedly failing to maintain, repair, and replace the leaky roof and undersized scupper.

(5) We enter no ruling regarding the merits of a claim brought by Suzanne Parisien, for the first time on appeal, that the condominium association breached a promise, allegedly made after November 3, 2020, to repair Parisien's condominium unit.

(6) We affirm the summary judgment dismissal of Suzanne Parisien's claim under the consumer protection act against broker Stephanie Susen.

(7) We reverse the summary judgment dismissal of Suzanne Parisien's negligence claim against broker Stephanie Susen.

(8) We affirm the jury verdict and judgment in favor of Manuel Lucio and grant Lucio an award of reasonable attorney fees and costs on appeal against Suzanne Parisien.

The analysis for these eight conclusions follows in order.


## I.  Condominium Association & Its Board Members

Suzanne Parisien purports that Eighty South Jackson Street Condominium Association and the condominium association's board members, Karlie Neale, Renee Paquet, Ryan Conroy, Leslie Haynes, and Manuel Lucio, are liable for four acts or omissions:

1.  According to Parisien, the condominium association and board members maintained an inadequate reserve account and then failed to disclose the lack of a current reserve study.

2.  The condominium association and board members issued a false and incomplete resale certificate.

3.  The association and board members failed to maintain, repair, and replace the leaky roof and unprotected and undersized scuppers.

4.  The condominium association and board members refused to complete promised repairs to Parisien's condominium unit.

Suzanne Parisien does not distinguish between the association and the board members for purposes of her claims. Instead, she argues that board members assumed the same liability as the association. We discuss each of the targeted acts or omissions in the order listed above.

### A. Inadequate Reserve Account & Lack of Current Reserve Study

We first consider whether the condominium association and board members are liable for maintaining an inadequate reserve account and then failing to disclose the lack of a current reserve study. Two Washington legislative acts govern condominiums, the 1963 Horizontal Property Regimes Act (HPRA), codified in chapter 64.32 RCW, and the 1989 Washington Condominium Act (WCA), codified in chapter 64.34 RCW. The HPRA generally applies to all condominiums created between 1963 and July 1, 1990. *Lake v. Woodcreek Homeowners Association*, 169 Wn.2d 516, 521, 243 P.3d 1283

(2010). Because the HPRA lacks comprehensive guidance on the rights and responsibilities of a condominium association, some sections of the later WCA apply to condominiums created before July 1, 1990. RCW 64.34.010(1). The sections of the WCA that extend to condominium associations established before July 1990 apply only to circumstances occurring after July 1, 1990. RCW 64.34.010(1). Although Eighty South Jackson Condominium Association was founded in 1989, only WCA provisions govern the disputes on appeal because all circumstances relevant to Suzanne Parisien's appeal transpired after July 1990.

Pursuant to RCW 64.34.010(1), the WCA provisions promoting condominium reserve accounts and reserve studies apply to Eighty South Jackson Condominium Association. Condominium reserves are a dedicated pool of funds, which the WCA encourages an association to establish and which are administered by a condominium association's board of directors to cover future expenses related to the maintenance, repair, and replacement of shared elements within the complex. RCW 64.34.380(1). To properly budget for reserves, condominium association boards are tasked with, in the exercise of reasonable discretion, periodically preparing and updating a reserve study. RCW 64.34.388. A reserve study, which is a long-term financial planning tool, analyzes the physical condition of a condominium property's common areas and their estimated repair or replacement costs. By determining these factors, condominium associations can accurately budget for capital repair and replacement expenditures over time rather than impose an exorbitant assessment at the time of a major repair.

The association must perform an updated reserve study every three years unless a study would impose an unreasonable hardship. RCW 64.34.380(3). Regardless of hardship, however, a condominium association must prepare a reserve study if more than three years has passed since the last study and unit owners holding 20 percent of the votes demand that the association perform an updated study. RCW 64.34.386(1). Suzanne Parisien forwards no evidence that any owner of a condominium unit in Eighty South Jackson Condominium Association demanded an updated reserve study before she purchased unit 405.

Despite these reserve account and reserve study mandates, the WCA explicitly immunizes a condominium association and its board members from liability for neglecting to establish a reserve account and to prepare reserve studies in a timely manner:

> Monetary damages or any other liability may not be awarded against or imposed upon the association, the officers or board of directors of the association, or those persons who may have provided advice or assistance to the association or its officers or directors, for failure to: establish a reserve account; have a current reserve study prepared or updated in accordance with RCW 64.34.380 through 64.34.388; or make the reserve disclosures in accordance with RCW 64.34.382 and 64.34.410(1)(oo) and 64.34.425(1)(s) [now (t)].

RCW 64.34.390 (alteration added).

Parisien cajoles that her claim seeks liability because the association and board members failed to *disclose* the lack of a current reserve study rather than because they failed to *perform* a reserve study. Regardless, RCW 64.34.390 grants the condominium

association and its board members immunity for failing to disclose information about a reserve study. And Parisien does not directly address the import of RCW 64.34.390 to her claim based on a lack of a current study.

Throughout her brief, Suzanne Parisien also complains of an inadequate reserve amount, which led to her later paying higher assessments than if the condominium association and board members had accumulated a substantial reserve fund before her purchase of unit 405. Any claim for failing to maintain a sufficient reserve account also fails under RCW 64.34.390. The superior court correctly granted the condominium association and its individual board members summary judgment on all claims concerning the reserve account.

## B. Resale Certificate

We next address whether Eighty South Jackson Street Condominium Association and its board members are liable for errors and omissions in the resale certificate. Suzanne Parisien alleges that the condominium association and the individual board members (1) misrepresented that there were no building code violations, (2) failed to warn her about the association's lack of a current reserve study, and (3) declined to caution her about the risks associated with the lack of a current reserve study. She seeks recovery both under the WCA and the common law cause of action for negligent misrepresentation. We have already concluded that RCW 64.34.390 shields the condominium association and individual board members from liability for failing to warn about the lack of sufficient reserves or to disclose the absence of a current reserve study

38

in the resale certificate. However, neither the condominium association nor its board members enjoy statutory immunity for misrepresenting the lack of any building code violations in the resale certificate. The board members do not argue that the law limits liability based on the resale certificate to the association. We proceed, as does Suzanne Parisien, on the assumption that liability under the statute may extend to the board members. Accordingly, we limit our analysis of this issue to whether the association and board members are liable for failing to disclose building code violations in the resale certificate.

RCW 64.34.425 requires a condominium owners association, upon request and payment, to furnish to a condominium owner a signed resale certificate for the owner to forward to a prospective purchaser. The statute demands that the certificate disclose any building code violations:

> (1) . . . [A] unit owner shall furnish to a purchaser before execution of any contract for sale of a unit, or otherwise before conveyance, a resale certificate, signed by an officer or authorized agent of the association and based on the books and records of the association and the actual knowledge of the person signing the certificate, containing:
>
> (o) A statement as to whether there are any violations of the health or building codes with respect to the unit, the limited common elements assigned thereto, or any other portion of the condominium; [and]
>
> . . . .
>
> (2) The association, within 10 days after a request by a unit owner, and subject to payment of any fee imposed pursuant to RCW 64.34.304(1)(1), shall furnish a resale certificate signed by an officer or authorized agent of the association and containing the information necessary to enable the unit owner to comply with this section. . . . The unit owner shall also sign the certificate but the unit owner is not liable to the purchaser for any erroneous information provided by the association

and included in the certificate unless and to the extent the unit owner had actual knowledge thereof.

RCW 64.34.425(1)(o), (t), (2) (alterations added). Another section of the WCA imposes liability on the condominium association or board members if either breaches one of its duties under the act:

If a declarant or any other person subject to this chapter fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award reasonable attorney's fees to the prevailing party.

RCW 64.34.455. A third section calls for the liberal administration of remedies for failing to perform as the WCA requires but generally prohibits consequential, special, and punitive damages:

(1) The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed. However, consequential, special, or punitive damages may not be awarded except as specifically provided in this chapter or by other rule of law.
(2) Except as otherwise provided in RCW 64.55.100 through 64.55.160 or chapter 64.35 RCW, any right or obligation declared by this chapter is enforceable by judicial proceeding. The arbitration proceedings provided for in RCW 64.55.100 through 64.55.160 shall be considered judicial proceedings for the purposes of this chapter.

RCW 64.34.100.

A question of fact exists as to whether the building violated the code. According to Parisien's expert architect, James Riley, the roof drainage scupper was undersized and lacked overflow protection required by the building code even at the time the roof was

installed. Also, the association allowed Manuel Lucio to modify the roof, and those modifications violated the code. In its briefing, neither the association nor the board members dispute these purported code violations.

When a statute, like RCW 64.34.425, imposes a duty to disclose information, an association and its board members also may be liable for negligent misrepresentation. *Alexander v. Sanford*, 181 Wn. App. 135, 177, 325 P.3d 341 (2014), *review granted*, 181 Wn.2d 1022, 339 P.3d 634 (2014). In order to state a claim for negligent misrepresentation, a plaintiff must allege that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007); *Alexander v. Sanford*, 181 Wn. App. 135, 179 (2014).

A condominium association and its board members should foresee that condominium units will be bought and sold. *Alexander v. Sanford*, 181 Wn. App. 135, 179 (2014). And, because condominium unit sellers carry a duty to disclose certain information to purchasers pursuant to RCW 64.06.020, board members of the association have reason to know that the representations in the certificate will be forwarded by owners to purchasers.

Suzanne Parisien presents evidence that, if believed by the trier of fact, satisfies each element of negligent misrepresentation. The condominium association and its board members prepared the resale certificate expecting potential buyers to read it. They affirmatively represented that the common areas did not violate the building code when the condominium's 1998 reserve analysis stated that ponding on the roof violated building code requirements and that the roof lacked overflow scuppers that are required by current code. The condominium association and board failed to take reasonable steps to confirm the accuracy of the information provided. Suzanne Parisien reasonably relied on the representation to her detriment. The condominium association and board do not argue against Parisien's reasonable reliance.

Suzanne Parisien also presents facts on which a jury could reasonably conclude that the misrepresentation in the resale certificate caused her injury or damage. She purchased unit 405 based on the assumption that disclosed leaks were anomalies and the building complied with code. She would not have purchased unit 405 if she had known of the ongoing leaks and roof defects. Once Parisien became an owner, she became liable for her share of deferred maintenance, repair, and replacement expenses above and beyond the reserve account balance. She suffered extensive personal and property damage and diminishment in the value of her condominium unit. She has experienced inconvenience.

In response to Suzanne Parisien's claim that the condition of the condominium roof violated the building code, Eighty South Jackson Condominium Association and the

board members assert eight defenses.  First, according to them, they could rely on a manager to prepare the resale certificate.  Second, and related to the first ground, the business judgment rule shields them from liability.  Third, Suzanne Parisien and her agents failed to investigate the adequacy or accuracy of the resale certificate.  Fourth, a 2020 reserve study showed the condominium building to be in very good condition.  Fifth, the defect that caused the flooding lay in an area assigned to Suzanne Parisien to maintain.  Sixth, and related to ground five, the building code violation did not cause the water intrusion.  Seventh, the independent duty doctrine protects the association from liability.  Eighth, Article 17 of the condominium association's declaration grants the condominium association and board members protection from liability for water leaks and downpours.  We now review these eight defenses in such order, rejecting all of them.

### 1 and 2.  Reliance on professionals and business judgment rule

The condominium association and board members emphasize that they are not liable for negligently misrepresenting that the building did not violate the building code because they relied on hired professionals to maintain the common areas.  Presumably, this argument extends to hiring professionals to prepare the resale certificate.  The association and board members cite Section 10.3 of the condominium association covenants, RCW 24.03.127, RCW 64.34.388, RCW 64.34.390, the business judgment rule, *Eylander v. Prologis Targeted U.S. Logistics Fund, LP*, 2 Wn.3d 401, 539 P.3d 376 (2023), and *Schwarzmann v. Association of Apartment Owners of Bridgehaven*, 33 Wn. App. 397, 403, 655 P.2d 1177 (1982), for this contention.  The condominium association

cites some of the statutes and cases with little analysis as to their importance.  We address each authority in such order.

Article 10.3 of the Eighty South Jackson Condominium Association covenants permits the condominium association board of directors to delegate administrative duties to a manager or officer of the association, or in such manner as may be provided by the bylaws.  We observe that the provision does not sanction the hiring of an independent contractor.  The condominium association cites no bylaw that expressly permits delegation of administrative duties to a contractor.  We, nonetheless, assume Article 10.3 extends to independent contractors.  While Article 10.3 of the covenants permits the delegation of board members' duties, the article does not immunize the condominium association from liability for the performance of the employee or contractor.

The Washington legislature repealed RCW 24.03A.127, on which the condominium association and board members rely.  The legislature has since placed the language from the statute, on which the association and board members lean, in RCW 24.06.153.  That language declares that an officer is entitled to rely on statements prepared by employees of the corporation whom the officer reasonably believes to be reliable and competent in the matter presented:

> (2) In discharging the duties of a director or an officer, a director or officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:
> (a) One or more officers or employees of the corporation whom the director or officer reasonably believes to be reliable and competent in the matters presented; or

(b) Legal counsel, public accountants, or other persons as to matters
the director or officer reasonably believes are within the person's
professional or expert competence.

RCW 24.06.153. This statute only excuses board members from liability if the situation

fits the statute's conditions for immunity. It does not grant the corporation immunity.

Thus, the statute does not aid the condominium association. We address later whether the

board members, who the statute partially protects, justifiably relied on Gigit Koh as being

competent to prepare resale certificates.

RCW 64.34.388 imposes on a condominium association's board of directors the

duty of rendering decisions related to preparing and updating a reserve study. The statute

directs the board to exercise reasonable discretion when so deciding. RCW 64.34.390, as

we have already discussed, immunizes the condominium association and its board

members from conduct attendant to a reserve account or a reserve study. Nevertheless, it

does not provide protection for failing to disclose building code violations in a resale

certificate. Neither statute aids Eighty South Jackson Condominium Association or its

board members in their defense of allegedly misrepresenting the lack of building code

violations in the resale certificate.

Washington precedent shows that the business judgment rule limits only personal

liability of individual directors. *Bangerter v. Hat Island Community Association*, 14 Wn.

App. 2d 718, 737, 472 P.3d 998 (2020), *aff'd in part*, *rev'd in part*, 199 Wn.2d 183, 504

P.3d 813 (2022). In turn, this court has ruled that the business judgment rule does not

immunize corporations. *Bangerter v. Hat Island Community Association*, 14 Wn. App.

2d 718, 737 (2020). The Washington Supreme Court accepted review of our decision in *Bangerter* but avoided the question of whether the rule shields the corporation in addition to its officers. *Bangerter v. Hat Island Community Association*, 199 Wn.2d 183, 192-93(2022). We conclude that the business judgment rule affords the condominium association no protection.

The business judgment rule immunizes corporate management from liability when (1) the decision to undertake the transaction lies within the power of the corporation and the authority of management, and (2) a reasonable basis exists to indicate that the transaction was made in good faith. *Scott v. Trans-System, Inc.*, 148 Wn.2d 701, 709, 64 P.3d 1 (2003); *Herdson v. Fortin*, 26 Wn. App. 2d 628, 647, 530 P.3d 220 (2023), *review denied*, 2 Wn.3d 1009, 539 P.3d 7 (2023). The rule assumes that association officers render a decision after weighing options. It presumes that, in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken serves the best interests of the company. *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009). The rule does not, however, shield a corporate director who has acted in bad faith. *Yates v. Holt-Smith*, 319 Wis. 2d 756, 770 -71, 768 N.W.2d 213 (2009). If board members fail to exercise due care, they may not use the business judgment rule as a shield for their conduct. *Feliciano v. Geneva Terrace Estates Homeowners Association*, 2014 Ill 130269, 14 N.E.3d 540, 551, 383 Ill Dec. 257.

A business decision must precede application of the rule. *Tindall v. First Solar Inc.*, 892 F.3d 1043, 1047 (9th Cir. 2018); *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d

304, 313 (Del. 2015). A board must do more than passively rubber stamp the decisions of the managers. *Hill v. State Farm Mutual Automobile Insurance Co.*, 166 Cal. App. 4th 1438, 1476, 83 Cal. Rptr. 3d 651 (2008); *Barr v. Wackman*, 36 N.Y.2d 371, 381, 368 N.Y.S.2d 497, 329 N.E.2d 180, 188. (1975). Eighty South Jackson Street Condominium Association board members identify no decision that they rendered about the resale certificate or about whether the condominium building complies with the building code, let alone that the members used due care when reaching a decision. A jury could conclude that no care was exercised when allowing Gigit Koh to prepare the resale certificate or when failing to review the resale certificate for accuracy before providing it to Manuel Lucio.

*Eylander v. Prologis Targeted U.S. Logistics Fund, LP*, 2 Wn.3d 401(2023), addressed a homeowner's duty of reasonable care toward invitees. The court held that a landowner may satisfy its duty to guard the invitee against known or obvious dangers on the premises by delegating the duty of protection to an independent contractor. This ruling followed the principle that a principal who engages an independent contractor is generally not liable for injuries caused by an independent contractor's conduct as found in RESTATEMENT (SECOND) OF TORTS § 409. The Supreme Court noted, however, that a duty is nondelegable when required by statute, contract, franchise or charter, or by the common law.

A statute, RCW 64.34.425, imposed on the condominium association the duty to prepare a resale certificate. The statute contains the word "shall" when assigning the

duty to prepare the certificate to the condominium association. RCW 64.34.425(1) demands that an officer or other authorized agent of the association sign the certificate. Therefore, we deem as nondelegable the duty to correctly complete the certificate.

The Washington Supreme Court in *Eylander* allowed the employer of the independent contractor to elude liability only because the employer had explicitly delegated the duty to the contractor and the delegation anticipated the harm of known or obvious dangers. The independent contractor had agreed to assume responsibility, if not liability, for dangers caused by its work. Eighty South Jackson Condominium Association and its board members have identified no explicit delegation of the duty to correctly prepare a resale certificate, which delegation anticipated the harm of errors in the certificate.

Another condition precedent to skirting liability, by the Supreme Court in *Eylander*, is that the employer of the independent contractor must exercise reasonable care in selecting a competent contractor with the proper experience and capacity to work. Facts could support a jury finding that Gigit Koh, who prepared the resale certificate, lacked experience and training in preparing a certificate. The condominium association did nothing to guarantee that Koh possessed the information or training needed to complete the certificate. Koh lacked access to all condominium association records except its reserve account balance. She used forms remaining from earlier sales. Koh admitted to the illogic of assigning her the task. No condominium association board member reviewed the resale certificate to check for accuracy and completeness. The

board members did not even know the identity of the person preparing the resale certificate, let alone the steps she took to perform the task. Based on the facts presented at summary judgment in this case, *Eylander* would not help the association or the board members avoid liability.

Eighty South Jackson Condominium Association and the individual board members also contend they delegated preparation of the resale certificate to the owner selling the subject condominium unit. Nevertheless, no proof shows an explicit delegation occurred. Suzanne Parisien's seller, Manuel Lucio, never testified that the condominium association delegated this duty to him. Furthermore, RCW 64.34.425 does not permit delegation to the unit owner.

### 3. Fault of Suzanne Parisien

We agree with the condominium association and board members that Suzanne Parisien, her attorney, and her real estate broker failed to probe the accuracy of comments in the resale certificate. But RCW 64.34.425 imposes no duty on the condominium purchaser to probe the representations made in the resale certificate. We discern that the statute seeks to save time and expense for the purchaser in investigating the condition of common areas, particularly since the condominium association has better access to those areas and knowledge of their conditions.

#### 4. 2020 study

Eighty South Jackson Condominium Association underscores that its 2020 reserve study confirmed the condominium building to be in good condition. The association does not explain why the study would inoculate it from liability based on code violations.

#### 5 and 6. Causation

Eighty South Jackson Street Condominium Association and the individual board members assert that all experts, including Suzanne Parisien's architect, concur that Suzanne Parisien's unit's HVAC system, not the building's scupper system, caused the November 3, 2020 leak. According to the association and board members, even if a scupper became blocked, the flooding was caused by a breakage in the HVAC's insulation line. These assertions imply Parisien failed to produce proof of the sixth element of her negligent misrepresentation claim – that the false information communicated in the resale certificate caused her damages.

A party's act or omission could constitute a proximate cause for damages sustained by the claimant if the act or omission was a substantial factor in causing the damage even if other causes contributed to the damage. *Roemmich v. 3M Co.*, 21 Wn. App. 2d 939, 951, 509 P.3d 306 (2022). Also, more than one event may proximately cause damage. *Carroll v. Akebono Brake Corp.*, 22 Wn. App. 2d 845, 883, 514 P.3d 720 (2022). The condominium association ignores the full opinion to which Suzanne Parisien's architect, James Riley, testified. According to Riley, the deteriorated piece of HVAC insulation caused the damage only because of the undersized scupper that violates

code. Therefore, the association's and board members' allegedly false statement in the resale certificate that there were no building code violations could be a proximate cause of Parisien's alleged damages related to the resale certificate.

Finally, the condominium association and board members fail to note that, even if David Perry added the HVAC unit on the roof, the condominium association covenants required the association to maintain the unit. The condominium association emphasizes paragraph 11.5.1 of the condominium declaration. This paragraph imposes on the unit owner the responsibility "for the construction, alteration, maintenance, repair or replacement of any plumbing fixtures, water heaters, fans, heating or other equipment . . . which may be in or connected with his [or her] Apartment." CP at 1275. The condominium association and board members interpret the "in or connected with" language in this section expansively to include HVAC equipment even if located outside of the unit. This interpretation conflicts with the association's obligation under paragraph 10.4.1 to maintain the common areas and Article 6's broad definition of "common areas" as "roofs" and "pipes, drains conduits, and wires, wherever they may be located whether in partitions or otherwise and whether they serve one Apartment, all Apartments or the Common Areas." CP at 1260. A full reading of the Declaration evidences an intent for unit owners to stay off the roof and allow the association to maintain the roof and all equipment located on the roof. So even if we concluded that the insulation from the pipe detaching from the pipe solely caused the flood, the association could still face liability.

### 7. Independent duty doctrine

In its brief, Eighty South Jackson Condominium Association and the individual board members posit that the independent duty doctrine may shield them from liability, while at the same time questioning the doctrine's application to Suzanne Parisien's claims. The condominium association and board members note that the Supreme Court, in *Alejandre v. Bull*, 159 Wn.2d 674, 153 P.3d 8644 (2007), applied the former economic loss rule to bar a negligent misrepresentation claim asserted between parties to the sale of real property. The association and board members then mention that *Jackowski v. Borchelt*, 174 Wn.2d 720, 278 P.3d 1100 (2012), holds that the duty to avoid fraudulent misrepresentation lies independent of the contract, and thus the tort can be maintained between contractual parties. The condominium association and board members cite *Jackowski* as concluding: "The same is true for a claim of negligent misrepresentation, but only to the extent the duty to not commit negligent misrepresentation is independent of the contract." *Jackowski v. Borchelt*, 174 Wn.2d 720, 738 (2012). The association then argues that its duty to conduct a reserve study or provide a current resale certificate is not independent from the Declaration. It highlights that the association entered into no purchase and sale agreement with Suzanne Parisien. Finally, according to the condominium association, this court, in *Alexander v. Sanford*, 181 Wn. App. 135 (2014), concluded that no relationship existed between future unit owners and condominium board members. According to the association, this court dismissed a negligent

52

misrepresentation claim against board members because the homeowners alleged no duty being held by board members independent of their statutory duties.

Some of the facts emphasized by the condominium association are untrue while other facts harm rather than support application of the independent duty doctrine. The association cites no portion of the condominium association Declaration of Covenants that imposes a duty to conduct a reserve study or to supply a resale certificate. Statutes impose those duties. Although a duty in tort may coexist with a duty under contract, the fact that the association and Suzanne Parisien entered into no contract bolsters the conclusion that the condominium association's duties arose outside of a contract. Finally, the law generally considers statutory duties to create tort liability, not contract liability.

A breach of a contract may simultaneously violate a tort duty that arises independently of the contract's terms. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 387, 241 P.3d 1256 (2010) (Plurality opinion). Stated differently, an independent tort duty can overlap with a contractual obligation. *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 387 (2010).

In *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wn.2d 380 (2010), the Supreme Court abandoned the former phraseology of "economic loss rule" for the new vernacular of "independent duty doctrine." The misnomer economic loss rule imparted the impression that any time a plaintiff seeks recovery for an economic loss, the plaintiff cannot recover in tort. The rule gathered excessive types of injury into its orbit. Tort law often allows recovery for economic losses, even if the parties maintain a contractual

relationship. Since *Eastwood v. Horse Harbor Foundation, Inc.*, a claimant may recover damages, including economic damages, if the damages result from a breach of a tort duty independent of any contract duty.

*Eastwood* involves a landlord who sued a tenant for damage to property occurring during the tenant's occupancy of the property. The lease between the parties required the tenant to keep the property in good repair. The tenant also covenanted to surrender the premises, at the end of the lease, in the same condition as when it entered the property. The Supreme Court held that the landlord could recover her economic loss from the tenant for damage to the property under the tort theory of waste independent of the lease terms. The tort precluded someone occupying property from causing substantial injury.

Because of two concurring opinions in *Eastwood*, the Supreme Court later synthesized its views on recasting the economic loss rule as the independent duty doctrine in *Jackowski v. Borchelt*, 174 Wn.2d 720 (2012). According to the court in *Jackowski*, the *Eastwood* court allowed the landlord recovery of economic loss because the claim for waste arose from a codified common law tort. An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. The Jackowskis sued its real estate agent as a result of the use of fill material under the purchased home. A geotechnical engineer had advised not to build the residence on the fill. The real estate agent did not inform the Jackowskis of the engineer's report. The home later shifted resulting in damage. The Jackowskis claimed the real estate agent should have warned them that the structure's foundation laid on fill

dirt. The Supreme Court ruled that the Jackowskis could maintain claims in fraud and negligent misrepresentation because the causes of action fit into the category of tort despite the Jackowskis maintaining a contract with the realtor.

Contrary to the argument of Eighty South Jackson Condominium Association and its board members, our decision in *Alexander v. Sanford*, 181 Wn. App. 135 (2014), wounds rather than benefits them. According to the condominium association and board members, this court concluded that no relationship existed between future unit owners and condominium board members, but that ruling applied to only board members who no longer served on the board when the plaintiffs bought their respective condominium units. The court rejected the argument that board members serving at the time of the plaintiffs' respective purchases possessed a duty only to the association and not unit owners. The court ruled that present board members' duties extended to the owners.

### 7. Article 17 Limitations of Liability

Article 17 of the condominium declaration contains two exculpatory clauses. The first clause, found in Section 17.1, protects both the condominium association and board members from liability for claims related to water intrusion. Section 17.2 covers only claims against board members.

Section 17.1 proclaims that the association is liable for another's water damages only to the extent the damages are covered by insurance:

> *Except to the extent covered by insurance* obtained by the Board pursuant to Article 13, neither the Association nor the Board . . . shall be liable for: . . . injury or damage to person or property caused by the

> elements, or *resulting from . . . water*, rain (or other liquid) . . . which may lead or flow from outside or from any parts of the buildings . . . or from any other places[.]

CP at 1297 (emphasis added.)

In response to the condominium association's reliance on Section 17.1, Susen Parisien first responds that water and rain damage was not the sole or predominant cause of her damage. Parisien relatedly contends that the exculpatory clause applies only to her claims based on failure to maintain, repair, and replace the roof. She further argues that the clause does not apply to her claims based on the false and incomplete resale certificate or failure to restore her unit. Second, Parisien contends that a question of fact exists as to whether liability insurance covers some or all of her claims. Third, Parisien relies on the rule that an exculpatory clause cannot shield the protected party from gross negligence.

In response to Suzanne Parisien's first argument, Eighty South Jackson Condominium Association retorts that all of the damage suffered by Parisien resulted from water. The condominium association adds that any theory forwarded by Parisien lacks significance as long as the theory seeks to recover from water damage.

We agree with the association that all damages sustained by Suzanne Parisien constitute water damage and fall within the parameters of Section 17.1. The section precludes liability for any damage "resulting from . . . water . . . which may . . . flow from outside." CP at 1297. The language applies regardless of how the water entered the condominium. Whether any roof defect caused the water intrusion lacks importance.

Regardless of whether Parisien seeks recovery under a common law theory of liability or on contract also holds no significance. The exculpatory clause applies to claims based on any false or incomplete resale certificate since the damage still resulted from intrusion of water.

We agree with Suzanne Parisien that Section 17.1 may not preclude a claim based on the condominium association's breach of promise to restore Parisien's condominium after the flooding. Such a cause of action would arise from conduct that occurred after and separate from the water damage. We will address this question later.

Suzanne Parisien cites *Windcrest Owners Association v. Allstate Insurance Co.*, 24 Wn. App. 2d 866, 524 P.3d 683 (2022), *review denied*, 1Wn.3d 1020 (2023) to support her argument that her property damage did not result from water. According to Parisien, the decision stands for the rule that, when wind-driven rain combines with defective building construction and inadequate repairs or maintenance to cause property damage, the law deems the condition of the building to be the efficient proximate cause of the damage because it created a pathway for water to enter. Water would not have seeped into the building but for the defective construction and maintenance.

*Windcrest Owners Association* involves a dispute between a condominium association and its commercial property insurer. Windcrest Owners Association sought insurance coverage for decay and rot to the condominium building resulting from wind-driven rain, organic growth, and pest damage. The insurance policy

required a "collapse" as a condition to coverage and excluded coverage for damage resulting from faulty construction and water damage. The parties' experts agreed that the alleged damage would not have occurred but for poor workmanship at the time of the building's construction. Based on the policy's language and testimony of the parties' experts, the trial court and this court rejected the association's claim that the insurer wrongfully denied coverage. This court reasoned that regardless of whether wind-driven rain penetrated the building's exterior because of faulty construction, faulty construction, which the policy did not cover, initiated the chain of causation. Further, the decision concludes that the condominium association failed to allege damage resulting from water or rain that satisfied the policy's specific definition of "water damage." Like Windcrest Owners Association, Suzanne Parisien neither alleged nor presented evidence that her damage resulted from something besides water, such as objects from the roof collapsing into her condominium unit along with the water.

We accept Suzanne Parisien's second argument that Eighty South Jackson Street Condominium Association has failed to show, in support of its summary judgment motion, that insurance fails to cover the water loss. Under the facts submitted by the community association and board members, the association tendered coverage for the November 3, 2020 leak to its commercial general liability insurance carriers, Aspen Specialty Insurance Company and James River Insurance Company. Both declined coverage due to the leak arising from broken insulation attended to unit 405's HVAC

system rather than deficiencies in the roof. These facts do not support that both policies provide no coverage. The companies could have wrongfully denied coverage. And the condominium association and board members did not provide the court with the respective insurance policies issued by the companies that denied coverage.

According to the condominium association, the two insurers denied coverage because of the reported nature of the leak resulting from broken insulation from unit 405's HVAC system rather than deficiencies in the roof. This denial of coverage fails to account for the loss also resulting from an undersized scupper, which constitutes a deficiency in the roof.

In reply to Suzanne Parisien's third response to the defense of Section 17.1, Eighty South Jackson Condominium Association and the board members mention that Suzanne Parisien did not allege gross negligence. We assume by this comment that the condominium association and board members wish to emphasize that Suzanne Parisien pled ordinary negligence, not "gross negligence." But then the association and board members fail to analyze whether the failure to employ the term "gross negligence" in the complaint precludes the plaintiff from arguing gross negligence when she has pled negligence. Some analysis would assist the court because at least two foreign decisions suggest that whether an allegation of negligence in the pleadings embraces a claim of gross negligence depends on the facts alleged in the complaint. *Bloom v. Dubois Regional Medical Center*, 409 Pa. Super. 83, 94-95, 597 A.2d 671 (1991); *Young v. Reese*, 118 Ga. App. 114, 117, 162 S.E.2d 831 (1968).

We need not review an implied argument that a party fails to develop or support with legal citations. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Therefore, we do not examine whether Suzanne Parisien needed to overtly plead gross negligence in order to argue that any negligence of the condominium association or board members qualified as gross negligence.

We strictly construe exculpatory provisions. *Scott v. Pacific West Mountain Resort*, 119 Wn.2d 484, 490, 834 P.2d 6 (1992). A preinjury waiver and release will not exculpate a defendant from liability for damages resulting from gross negligence. *Vodopest v. MacGregor*, 128 Wn.2d 840, 853, 913 P.2d 779 (1996). Gross negligence constitutes negligence "substantially and appreciably greater than ordinary negligence." *Swank v. Valley Christian School*, 188 Wn.2d 663, 684, 398 P.3d 1108 (2017). The difference between gross negligence and ordinary negligence requires a "fine-grained factual analysis" that is "generally not susceptible to summary judgment." *Swank v. Valley Christian School*, 188 Wn.2d 663, 684 (2017).

Suzanne Parisien identifies evidence in the summary judgment record to show gross negligence. The condominium association took no steps to safeguard that it prepared accurate resale certificates. Board members did not even know who prepared and signed the certificates. The condominium building suffered constant leaks in the roof. One expert warned the condominium association and board members that the lack of overflow scuppers violated the building code. Experts had recommended replacement of the roof. They ignored this salient advice.

Eighty South Jackson Condominium Association and the board members do not argue that the facts forwarded by Suzanne Parisien do not, as a matter of law, constitute gross negligence. Therefore, we conclude that the condominium association's and board members' defense based on Section 17.1 does not extend to claims of Parisien based on gross negligence.

In sum, for two reasons, the superior court erred when granting the condominium association summary judgment on Suzanne Parisien's claim based on an allegation that the condominium association and board members neglected to disclose building code violations. First, paragraph 17.1 might not shield Eighty South Jackson Street Condominium Association and individual board members from liability because of the possibility of insurance coverage. Second, Parisien forwards evidence of gross negligence.

Section 17.2 covers claims against board members. To repeat, Section 17.2 protects board members from personal liability to an owner for damage resulting from ordinary negligence but not gross negligence:

> 17. 2 <u>No Personal Liability</u>. So long as a Board member, Association committee member, Association officer, Declarant or Declarant's managing agent exercising the powers of the Board *has acted in good faith, without willful or intentional misconduct, upon the basis of such information as may be possessed by such person,* no such person shall be personally liable to any Owner, or other party, including the Association, for any damage, loss or prejudice suffered or claimed on account of any act, omission, error or negligence (*except gross negligence*), any discretionary decision, or failure to make a discretionary decision, by such person in such person's official capacity; provided, that this section shall not apply where

the consequences of such act, omission, error or negligence are covered by insurance obtained by the Board pursuant to Article 13.

CP at 1767 (emphasis added). The board members' immunity under Section 17.2 does not depend on a lack of liability insurance.

In response to the condominium association's reliance on Section 17.2, Suzanne Parisien, again, first responds that water and rain were not the sole or predominant causes of her damage. Parisien relatedly repeats that the exculpatory clause applies only to her claims based on failure to maintain, repair, and replace the roof. And she renews the argument that the clause does not apply to her claims based on the false and incomplete resale certificate or failure to complete restoration of her unit. We have already concluded that regardless of the failure to maintain the condominium building and regardless of errors in the resale certificate, the damage results from water intrusion.

We agree with Suzanne Parisien's contention that Section 17.2 does not absolve the board members from claims for gross negligence. In fact, the language of the section expressly excludes conduct qualifying as gross negligence. Suzanne Parisien identifies evidence in the summary judgment record to show gross negligence. The board members do not argue that the facts forwarded by Suzanne Parisien fail to show gross negligence.

Suzanne Parisien argues that Section 17.2's limited liability clause is unenforceable because it is contrary to the Board's duty of reasonable care in RCW 64.34.308(1), which cannot be waived. RCW 64.34.308(1) declares the general rule that elected board members must perform their duties with ordinary and reasonable care:

(1) Except as provided in the declaration, the bylaws, subsection (2) of this section, or other provisions of this chapter, the board of directors shall act in all instances on behalf of the association. In the performance of their duties, the officers and members of the board of directors are required to exercise: (a) if appointed by the declarant, the care required of fiduciaries of the unit owners; or (b) if elected by the unit owners, ordinary and reasonable care.

In turn, RCW 64.34.030 generally prohibits waiving the chapter's provisions by agreement:

Except as expressly provided in this chapter, provisions of this chapter may not be varied by agreement, and rights conferred by this chapter may not be waived. A declarant may not act under a power of attorney or use any other device to evade the limitations or prohibitions of this chapter or the declaration.

The board members, in their respondent's brief, fail to oppose Suzanne Parisien's reliance on RCW 64.34.030, other than to contend that the undisputed facts show the members exercised ordinary care. They do not argue that Section 17.2's limitation of liability survives scrutiny under RCW 64.34.030. We do not wish to make a party's arguments for them and need not consider undeveloped arguments in briefs for which a party has not cited authority. *Collins v. Clark County Fire District No. 5*, 155 Wn. App. 48, 96, 231 P.3d 1211 (2010). Thus, Suzanne Parisien's claims for ordinary negligence survive the board members' summary judgment motion in addition to claims for gross negligence.

### C. Negligent Maintenance

We move to the third of four acts or omissions about which Suzanne Parisien seeks to impose liability on the condominium association and board members. Parisien argues that the association and board members breached their duties found in tort, written in the Declaration of Covenants, and imposed by statute to properly maintain the roof and drainage system. According to Parisien, the condominium association and members of the board had more than 20-years' notice of leaks and of the need to replace the roof and took inadequate steps to do so. A 1998 reserve study prepared by Architectural Building Inspection forewarned that the condominium building roof lacked overflow scuppers in violation of building code requirements. Other experts recommended replacement of the roof.

We previously concluded that Suzanne Parisien forwarded sufficient facts to present a jury question of gross negligence. Logically, Parisien would also present a fact question of negligence as it concerns roof maintenance. Although the community association and board members deny negligence, they ignore the facts presented by Suzanne Parisien that could lead a jury to find negligence.

Two covenants in the condominium association declaration expose Eighty South Jackson Street Condominium Association and its individual board members to liability for failing to reasonably maintain the roof. Section 10.4.1 imposes on the board members, acting on behalf of the condominium association, the obligation to maintain common areas, including the roof. Section 6.1.8 of the Declaration also delegated to the

board members the authority and duty to maintain and repair "[a]ll other parts of the Property necessary or convenient to its existence, maintenance, and safety."  CP at 1261.

RCW 64.34.455 imposes liability on a condominium association and board members for breaching obligations under the Declaration:

> If a declarant or any other person subject to this chapter fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief.

Another section of the WCA declares the remedies for breached obligations:

> (1) The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed.  However, consequential, special, or punitive damages may not be awarded except as specifically provided in this chapter or by other rule of law.
> (2) Except as otherwise provided in RCW 64.55.100 through 64.55.160 or chapter 64.35 RCW, any right or obligation declared by this chapter is enforceable by judicial proceeding.

RCW 64.34.100.

The fact that the building's scupper system could have violated the applicable building codes adds to the community association's exposure to liability.  Under RCW 5.40.050, the trier of fact may consider a breach of a duty imposed by an ordinance as evidence of negligence.

In response to Suzanne Parisien's claim of failure to reasonably maintain the condominium building, Eighty South Jackson Street Condominium Association and the individual board members repeat the same eight arguments forwarded to defeat Parisien's

claim based on the errors in the resale certificate. The community association and board members meld the two factual contentions. We repeat our same conclusion. For two reasons, the superior court erred when granting Eighty South Jackson summary judgment on Suzanne Parisien's claim based on negligent maintenance of the roof. First, the exculpatory clause found in paragraph 17.1 might not shield Eighty South Jackson Street Condominium Association and the board members from liability because of the possibility of insurance coverage. Second, Parisien forwards evidence of gross negligence.

### D. Breach of Promise to Repair

We move to the fourth act or omission on which Suzanne Parisien seeks recovery against Eighty South Jackson Condominium Association. Parisien asserts on appeal that the condominium association breached promises to repair her condominium unit after the water intrusion on November 3, 2020. This claim differs from the negligent maintenance claim because Parisien bases this fourth claim on promises made after her condominium unit flooded. The condominium association made the promises in fulfillment of but also independent of Article 14 of the Declaration. In forwarding this claim, Parisien relies on the doctrine of equitable estoppel.

Eighty South Jackson Street Condominium Association and the board members respond with at least five arguments. First, Suzanne Parisien did not plead a cause of action for equitable estoppel in her complaint. Second, equitable estoppel cannot be employed by a plaintiff offensively. Third, Parisien cannot recover in estoppel because

she could not have justifiably relied on any promise made by them. Fourth, and related to the third contention, Parisien rests her estoppel claim on representations that the association and board members were legally responsible for the repairs. Legal representations, according to the condominium association and board members, lie outside the scope of estoppel. Fifth, the condominium association and board members based their promise to repair on the mistaken understanding that the association had installed the HVAC system.

We agree with Eighty South Jackson Street Condominium Association's and the board members' first contention, so we do not address their other arguments. Suzanne Parisien did not plead estoppel or a breach of a promise to repair that was made after the flooding. CR 15(b) allows the trial court to consider the complaint amended if the parties try the claim without any objection from the defendant. But Parisien never asserted equitable estoppel in response to the condominium association's summary judgment motion.

Generally, we do not consider issues raised for the first time on appeal. RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). And we will not entertain a cause of action or theory of recovery raised for the first time on appeal. *Schuck v. Beck*, 19 Wn. App. 2d 465, 480, 497 P.3d 395 (2021). In her reply brief, Suzanne Parisien does not respond to Eighty South Jackson Street Condominium Association's underscoring of her failure to plead equitable estoppel.

II.  Real Estate Broker Stephanie Susen

Suzanne Parisien asserts causes of action in negligence and under the CPA against her real estate broker, Stephanie Susen, and Susen's company, the Landover Corporation. Because the same analysis applies to both Susen and Landover, we only reference Susen in our discussion.  Parisien contends the superior court erroneously granted summary judgment to Susen.

Suzanne Parisien pegs both causes of action on Stephanie Susen's alleged failure to warn her of conditions at the condominium building and the financial situation of Eighty South Jackson Condominium Association.  She labels these conditions and the situation as "red flags."  These crimson pennants included past water intrusions in units 402 and 405, the existence of an active water leak in unit 402, the condominium association's lack of a current reserve study, and the outdated resale certificate. According to Parisien's experts, the disclosure of water leaks in Form 17 should have led Susen to talk to Parisien, if not also Parisien's building inspector, of the need for a thorough inspection.  The provision of a 1998 reserve study and the delivery of an outdated resale certificate should have led Susen to warn Parisien of the potential risk of future significant special assessments.  Susen should have referred Parisien to experts for a current evaluation of the condominium building common areas and the condominium association's finances.  According to Parisien, Susen's failure to warn her constituted not only negligence, but deceptive acts that could be repeated with other Susen's clients.

*A. Negligence*

To avoid summary judgment dismissal of her claim for negligence, Suzanne Parisien must establish a prima facie case of the claim's essential elements: (1) Susen owed a legal duty to Parisien, (2) Susen negligently breached the duty, and (3) Susen's breach proximately caused injury. *Boguch v. Landover Corp.*, 153 Wn. App. 595, 609, 224 P.3d 795 (2009). Stephanie Susen focuses her defense of the claim on the lack of any violated legal duty. We conclude that Parisien forwards evidence to defeat a summary judgment motion on her negligence cause of action against broker Susen.

Stephanie Susen argues that Suzanne Parisien cannot establish the duty element of her negligence claim. Susen asserts that each alleged breach would have required her to investigate facts and that she owed no duty to investigate the condominium's condition, the condominium association's financial condition, or the accuracy of any statement made by any source that she reasonably believed to be reliable. Susen further argues that Parisien's negligence claim fails as a matter of law because Parisien could have discovered the defects about which she now complains with a reasonably prudent inspection.

A real estate broker owes non-waivable statutory duties to a buyer she represents. RCW 18.86.030 declares in part:

> (1) A broker owes the following duties to their principal and to all parties in a transaction, which may not be waived:
> (a) To exercise reasonable skill and care;
> (b) To deal honestly and in good faith;
> . . . .

(d) To disclose all existing material *facts known by the broker* and not apparent or readily ascertainable to a party; provided that *this subsection shall not be construed to imply any duty to investigate* matters that the broker has not agreed to investigate[.]

. . . .

(2) Unless otherwise agreed, a broker owes no duty to conduct an independent inspection of the property or to conduct an independent investigation of either party's financial condition, and *owes no duty to independently verify the accuracy* or completeness of any statement made by either party or by any source reasonably believed by the broker to be reliable.

(Emphasis added.) RCW 18.86.050(1) adds:

Unless additional duties are agreed to in writing signed by a buyer's agent, the duties of a buyer's agent are limited to those set forth in RCW 18.86.030 and the following, which may not be waived except as expressly set forth in (e) of this subsection:

. . . .

(c) To advise the buyer to seek expert advice on matters relating to the transaction that are beyond the agent's expertise[.]

A common law tort affords a vehicle for recovery for a breach of statutory duties under RCW chapter 18.86. *Jackowski v. Borchelt*, 174 Wn.2d 720, 735 (2012); *Falcon Properties LLC v. Bowfits 1308 LLC*, 16 Wn. App. 2d 1, 8, 478 P.3d 134 (2020).

Suzanne Parisien does not fault Stephanie Susen for failing to disclose facts known by Susen. Parisien does not blame Susen for failing to independently verify the condition of the condominium building or the financial condition of the condominium association. We discern instead that Suzanne Parisien's negligence claims focus on the failure of Stephanie Susen to advise Parisien to investigate conditions further herself or through an expert in a field other than that of real estate broker. We consider Parisien's

assertions to fall within RCW 18.86.050(1)(c), which imposes a duty on a real estate broker for the buyer to advise the buyer to seek expert advice on matters relating to the transaction. Susen's argument on summary judgment focuses on her lack of duty to independently inspect the building or assess the condominium association's finances. The argument ignores Parisien's experts' criticism of the failure to encourage Parisien to thoroughly explore red flags with other professionals.

Suzanne Parisien hired a building inspector, but facts suggest the inspector did not thoroughly examine the roof conditions of the condominium building. No facts suggest that the condominium association would have denied the inspector access to the roof. Susen presents no facts that she encouraged Parisien to insist that her inspector perform a thorough examination of the roofs' conditions. Parisien knew of leaks in units 402 and 405 but did not know of the conditions on the roofs, particularly the undersized scupper or the HVAC system that interfered in water flow from the roof. A thorough inspection could have alerted Parisien to these alleged defects on the roofs.

Suzanne Parisien did not hire anyone to investigate the financial condition and needs of the condominium association. Susen could have encouraged Parisien to do so, but Susen did not.

Stephanie Susen emphasizes the rule that, when a buyer is on notice of a defect, the buyer must make further inquiries of the seller. *Douglas v. Visser*, 173 Wn. App. 823, 830-32, 295 P.3d 800 (2013); *Puget Sound Services Corp. v. Dalarna Management Corp.*, 51 Wn. App. 209, 210, 752 P.2d 1353 (1988); *Sloan v. Thompson*, 128 Wn. App.

776, 781, 115 P.3d 1009 (2005).  This rule applies to a claim by the property buyer against the seller, not the real estate broker.  Parisien could employ the rule to her benefit because RCW 18.86.050(1) imposes on the real estate broker a duty to advise the buyer to seek expert advice and knowledge of possible defects.

Stephanie Susen emphasizes language in Suzanne Parisien's purchase and sale agreement with Manuel Lucio that warned Parisien that the real estate brokers did not agree to investigate conditions.  This language does not preclude liability for failing to encourage a client to hire another expert to investigate the conditions of the premises or the financial condition of a condominium association.

One may argue that withholding from the real estate broker a duty to investigate property conditions and the financial stability of a third party but imposing on the broker a duty to encourage the buyer to seek advice from other professionals on those subject matters makes little sense.  After all, most purchasers should know to hire a building inspector and the potential lender will require a house inspection.  But the legislature may have wanted to impose on the real estate broker this duty, under RCW 18.86.030(1)(c), because of novice buyers and because of the rush at which buyers purchase property and the encouragement of real estate agents to the buyer to quickly purchase a residence.  Some buyers need a push to thoroughly examine circumstances before closing the transaction.  The duty extends only to the buyer's broker, not the seller's broker.

Stephanie Susen argues that Suzanne Parisien's experts provided opinions of law, which must be ignored by this court.  Nevertheless, the law deems expert testimony

concerning the standard of care of a real estate agent proper, if not essential. *Young v. Era Advantage Realty*, 2022 MT 138, 409 Mont. 234, 239, 513 P.3d 505, *Pellet v. Keller Williams Realty Corp.*, 177 Conn. App. 42, 64, 172 A.3d 283 (2017), *Professional Management Midwest, Inc. v. Lund Co.*, 284 Neb. 777, 783, 826 N.W.2d 225 (2012), *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 286, 607 N.E.2d 253, 180 Ill. Dec. 359 (1992), *aff'd*, 158 Ill. 2d 375, 634N.E.2d 707, 199 Ill. Dec. 654 (1994).

### B. Consumer Protection Act Violations

To withstand summary judgment on her private CPA claim, Suzanne Parisien needed evidence that tended to show (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to her business or property, and (5) causation. *Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 316, 472 P.3d 990 (2020). A plaintiff alleging injury under the CPA must establish all five elements. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

Suzanne Parisien contends that Stephanie Susen committed a deceptive act when purportedly failing to disclose the presence of an active leak in a nearby unit and the risks resulting from the past history of leaking. Parisien adds that Susen deceived her by failing to disclose the lack of a current reserve study. Parisien argues that real estate sales constitute trade or commerce within the meaning of the consumer protection act. She contends that Susen's conduct could repeat itself and thus affects the public interest.

Stephanie Susen argues that Suzanne Parisien failed to establish elements one, two, and three of a consumer protection act (CPA). We address only the second element. The undisputed facts show that Parisien faults Susen for breaching professional responsibilities, which case law places outside the confines of the trade or commerce element of the CPA.

Under Washington's consumer protection act:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

RCW 19.86.020. RCW 19.86.010 defines "trade" and "commerce" for purposes of the act as:

> (2) "Trade" and "commerce" shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington.

Beginning in *Short v. Demopolis*, 103 Wn.2d 52, 691 P.2d 163 (1984), our Supreme Court, with this court to follow, has reviewed whether challenged conduct of a licensed professional falls within the purview of "trade or commerce" for purposes of the consumer protection act. The Supreme Court has distinguished between entrepreneurial or commercial aspects of the practice of a profession and the quality of service provided by the professional. *Haberman v. Washington Public Power Supply System*, 109 Wn.2d 107, 169-70, 750 P.2d 1032 (1987). If the claimant sues based on the entrepreneurial practice of a professional, the conduct may fall within "trade or commerce." *Short v. Demopolis*, 103 Wn.2d 52, 60 (1984). Entrepreneurial aspects include, but probably are

not limited to, the price of services, billing, collecting fees, obtaining clients, retaining

clients, and dismissing clients. *Short v. Demopolis*, 103 Wn.2d 52, 61 (1984); *Haberman*

*v. Washington Public Power Supply System*, 109 Wn.2d 107, 169-70 (1987). Claims that

focus on the competence of the service, the substantive quality of the service, or the skill

of the professional, such as malpractice and negligence causes of action, fall outside the

confines of "trade and commerce." *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 603, 200

P.3d 695 (2009); *Short v. Demopolis*, 103 Wn.2d 52, 61-62 (1984); *Haberman v.*

*Washington Public Power Supply System*, 109 Wn.2d 107, 169 (1987); *Wright v. Jeckle*,

104 Wn. App. 478, 482-83, 16 P.3d 1268 (2001); *Ramos v. Arnold*, 141 Wn. App. 11, 20,

169 P.3d 482 (2007).

The earliest decision, *Short v. Demopolis*, involved a suit against an attorney.

Washington courts have expanded the distinction between entrepreneurial aspects of a

professional and the standard of service to health care professionals, financial advisors,

real estate agents, and property appraisers. *Michael v. Mosquera-Lacy*, 165 Wn.2d 595

(2009); *Wright v. Jeckle*, 104 Wn. App. 478, 482-83 (2001); *Quimby v. Fine*, 45 Wn.

App. 175, 180, 724 P.2d 403 (1986) (health care professional); *Haberman v. Washington*

*Public Power Supply System*, 109 Wn.2d 107, 169-70 (1987) (financial advisor);

*Edmonds v. John L. Scott Real Estate*, 87 Wn. App. 834, 942 P.2d 1072 (real estate

agent); *Ramos v. Arnold*, 141 Wn. App. 11 (2007) (property appraiser).

When discerning whether the conduct, for which the client sues the professional,

concerns entrepreneurial aspects, the court often reviews whether the professional

75

engaged in a dishonest or unfair practice motivated by financial gain. *Wright v. Jeckle*, 104 Wn. App. 478, 44 (2001); *Benoy v. Simons*, 66 Wn. App. 56, 65, 831 P.2d 167 (1992); *Quimby v. Fine*, 45 Wn. App. 175 (1986). Cases also focus on advertising of the professional or steps taken to solicit clients. *Wright v. Jeckle,* 104 Wn. App. 478 (2001).

Whether professional conduct implicates entrepreneurial aspects of a profession is a question of fact. *Eriks v. Denver*, 118 Wn.2d 451, 465, 824 P.2d 1207 (1992); *Wright v. Jeckle*, 104 Wn. App. 478, 482 (2001); *Quimby v. Fine*, 45 Wn. App. 175, 182 (1986). Despite this principle, we assume that, like other questions of fact, the court may still grant summary judgment if a party fails to forward critical facts that support a claim or defense.

This appeal exclusively involves the quality of services of a professional. Suzanne Parisien is suing Stephanie Susen for professional negligence. Both parties forward experts as to whether Stephanie Susen violated the standard of care of a real estate broker. The opinions implicate the extent to which the broker must investigate the conditions of the property and the financial condition of the related homeowners association. Stephanie Susen gave no representations that she would seek to procure information for Parisien. Parisien does not complain about any advertisement by Susen. Parisien does not quarrel about any billing.

Because Suzanne Parisien principally relies on *Edmonds v. John L. Scott Real Estate*, 87 Wn. App. 834 (1997), we review the case in detail. Cora Edmonds signed a buyer/broker agreement with James Tjoa, an agent of John L. Scott Real Estate, Inc.

Tjoa promised Edmonds that he would work exclusively in her best interests. Tjoa

showed her a house listed by another Scott agent, Erma Zimmerman. Edmonds noticed

puddles of water in the basement. After speaking with Zimmerman, Tjoa informed

Edmonds that the problem would be repaired and the repair warrantied. Tjoa assured

Edmonds that he would draft the necessary documents to guarantee her a dry basement.

Tjoa added language to the standard inspection contingency addendum to the earnest

money agreement: "Seller to furnish copy of warranty for drainage work done." Tjoa

assured Edmonds that this language sufficed to ensure a dry basement. Edmonds signed

the agreement and paid $5,001 in earnest money.

The inspection contingency conditioned the agreement on Cora Edmonds'

approval of a written building inspection report. The inspection report confirmed the

existence of a water problem in the basement and noted that the seller would install a

sump pump in the basement. Nevertheless, agent Erma Zimmerman gave James Tjoa

and Edmonds a property information form in which the seller averred the lack of

knowledge of any existing problems with flooding or drainage on the property and that

Bodine Construction had corrected a prior problem. After receiving the property

information form, Edmonds discovered more water in the basement. She notified Tjoa,

who, after talking with Zimmerman, informed Edmonds that Bodine had done more work

at the house. Steve Bodine of Bodine Construction, however, told Edmonds that the

installation of the sump pump did not correct the problem and additional external work

was needed in order to divert water from the house. Edmonds called Tjoa daily and

expressed concern about the water problem. Despite this, Tjoa did nothing to determine Bodine's progress in completing the additional drainage work. As a result, Edmonds, through her counsel, notified Tjoa that she was terminating the transaction and demanding the return of her earnest money.

Pursuant to standard company practice, John L. Scott's general counsel assumed responsibility for the Cora Edmonds' file. Without conducting any factual investigation into Edmonds' complaints regarding water in the basement and without undertaking to ascertain whether any warranties covered the work, Scott's counsel unilaterally determined that the drainage problem had been remedied. Less than a week later, the basement flooded again. Nonetheless, Scott's counsel reiterated to Edmonds' counsel that the drainage problem had been fixed. When Edmonds refused to close on the ground that the water problem had not been fixed, Scott's counsel declared her in default and directed Scott's trust department to disburse half of her earnest money to the sellers and half to Tjoa and Zimmerman.

The trial court found that John L. Scott breached its fiduciary duty with respect to its disbursement of the earnest money, breached the earnest money agreement, negligently prepared the earnest money agreement, and committed two violations of the consumer protection act. Real estate agent Erna Zimmerman failed to disclose material facts by failing to disclose the extent of the drainage work performed before Edmonds signed the earnest money agreement and by presenting a property information form containing statements she and James Tjoa knew were false. These acts by Zimmerman

violated the CPA.  In addition, the court found that Scott's disbursement of the earnest money constituted conversion, a breach of fiduciary duty, and a violation of the CPA.

On appeal, this court affirmed the trial court's ruling that John L. Scott's conduct was unfair and deceptive.  Although Scott's standard earnest money agreement provided that, in the event of default by the purchaser, the earnest money will be forfeited to the seller as liquidated damages, the contract did not disclose that, in the event of a dispute as to whether the purchaser is in default, Scott's general counsel would unilaterally determine whether there was a default and how the earnest money would be disbursed.  In addition, Scott possessed a financial interest in its counsel's determination because Scott was a potential recipient of a portion of the funds if the purchaser defaulted.  Scott did not warn that another of its agents might simultaneously act as the seller's agent.  Scott's counsel told Edmonds' counsel that the seller had solved the drainage problem, when counsel lacked any knowledge of a fix.  By John L. Scott's admission, the brokerage firm had followed these practices hundreds of times.

John L. Scott argued that its practice of disbursing earnest money related to the exercise of its professional judgment, not the entrepreneurial aspects of its services.  Scott cited *Haberman v. Washington Public Power Supply System*, 109 Wn.2d 107 (1987), and *Short v. Demopolis*, 103 Wn.2d 52 (1984), for its position.  This court cursorily responded that Scott's conduct did not parallel the conduct of an attorney rendering strategic decisions in a client's case.  Cora Edmonds complained about the business practices of Scott.

In *Edmonds v. John L. Scott*, this court also addressed whether two of the trial court's other findings satisfied the elements of a consumer protection act violation. First, real estate agents Zimmerman and Tjoa knew that the sellers' assertions in the property information form—that sellers were aware of no existing problem with the drainage and prior problems had been corrected—were false. Second, Zimmerman failed to disclose to Edmonds the extent of the previous drainage work or provide Bodine's 15–year warranty on the drainage work performed the month before Edmonds signed the earnest money agreement. This court ruled that the presentation of a false property information form is a deceptive and misleading practice that was "compounded" by Scott's failure to disclose material facts concerning ongoing drainage work and warranties. The presentation of a property information form containing misrepresentations as to the condition of the property was not only unfair but also had the capacity to deceive the public. Without any analysis other than one sentence, the court wrote that "the presentation of the form in the course of negotiations for the purchase and sale of real estate occurred in the conduct of trade or commerce satisfied the second element of a CPA violation." 87 Wn. App. at 849.

We juxtapose *Edmonds v. John L. Scott Real Estate* with *Ramos v. Arnold*, 141 Wn. App. 11 (2007). Luis and Karina Ramos alleged that property appraiser Debbie Arnold committed an unfair or deceptive act by failing to mention major defects, including water leaks, in the residence in the appraisal report, which prevented further investigation and caused the Ramoses to enter into the purchase and sale agreement for

the residence.  This court affirmed summary judgment dismissal of the consumer

protection act claim against the appraiser based on the rule that the entrepreneurial or

commercial aspects of professional services, not the substantive quality of services

provided, fall within the purview of trade or commerce.  To repeat, entrepreneurial

aspects include how the cost of services is determined, billed, and collected and the way a

professional obtains, retains, and dismisses clients.  According to the court, claims

directed at the competence of and strategies employed by a professional amount to

allegations of negligence and are exempt from the Consumer Protection Act.  The

Ramoses' complaint targeted the alleged inadequacy of the appraisal rather than the

entrepreneurial aspect of Arnold's business.  The claim amounted to an allegation of

negligence.

*Ramos v. Arnold* made no mention of *Edmonds v. John L. Scott*.  The two

decisions may conflict with regard to *Edmonds*' ruling that Scott agents violated the

consumer protection act by failing to fully disclose water leaks.  We, nonetheless, deem

*Ramos v. Arnold* more in line with other Washington decisions and to Washington law

that distinguishes between entrepreneurial aspects and standard of care aspects of a

profession.  We emphasize that John L. Scott combined its failure to disclose continued

water problems with a conflict of interest and conversion of funds.  John L. Scott agents

knowingly deceived Edmonds.  These elements are missing in Suzanne Parisien's suit.

Another case involving a real estate broker is *Deegan v. Windermere Real

Estate/Ctr.-Isle, Inc.*, 197 Wn. App. 875, 391 P.3d 582 (2017).  Purchasers of homes on

Whidbey Island brought suit against real estate brokers for failing to comply with a county ordinance requiring the disclosure of aircraft noise from several airfields on the island. This court reversed a grant of a motion to dismiss under CR 12(b)(6). We addressed whether the violation of the ordinance constituted a deceptive or unfair act and whether the violation impacted the public interest. This court did not directly determine whether the conduct of the brokers constituted trade or commerce within the context of the consumer protection act.

Based on our review of Washington case law concerning CPA claims against real estate brokers and our review of the facts and arguments offered in support of Parisien's CPA claim against Susen, we conclude that the superior court did not err when it dismissed Parisien's CPA claim against Susen on summary judgment.

## IV. Manuel Lucio

We move to the claim against the final defendant sued by Suzanne Parisien. The claim against Manuel Lucio in his role as seller differs from the claims against the condominium association, board members of the association, and broker Stephanie Susen in that Parisien's causes of action against Lucio went to trial. Parisien sued seller Lucio for violation of RCW 64.06.020, breach of the purchase and sale agreement, negligent and intentional misrepresentation found in the seller disclosure statement, concealment, and deceit. The superior court instructed the jurors on these respective causes of action. On appeal, Parisien contends the superior court erred when delivering jury instruction 10 and failing to deliver her proposed jury instruction 17. Each addressed a condominium

unit seller's duty to disclose to the buyer defects in the condominium building common areas.

*Jury Instructions*

Jury instruction 10 declared:

> A party to a transaction has a duty to disclose to the other party, before the transaction is completed, the following circumstances: matters known to the party that the party knows to be necessary to prevent the party's partial or ambiguous statement of the facts from being misleading. Other than in these circumstances, a party to a transaction is not required to disclose information to the other party.

CP at 3997. This instruction suggests that the seller lacks any duty to disclose information, but, if the seller decides to disclose the information, the seller must disclose enough information to not mislead the buyer. So, the seller may remain silent no matter the pitfalls that could face the purchaser of the residence. We wonder if instruction 10 incorrectly limited the duty of a seller to disclose only defects about which he possesses actual knowledge. But Suzanne Parisien attacks the instruction on a different basis: The instruction did not expressly extend the duty to disclose flaws in common areas. Parisien's underlying complaints about instruction 10 concern its lack of specificity that the seller of a condominium unit possesses a duty to warn about defects in common areas of the condominium building. In turn, Parisien highlights that her proposed jury instruction informed the jury that the seller's duty of disclosure extended to the common areas.

Suzanne Parisien's assignment of error raises two detached questions. First, does the seller of a condominium unit hold a duty to warn a buyer of known defects or problems in the common areas? Second, did the trial court instruct the jury on any duty possessed by the seller to disclose problems with the common areas? We answer the second question in the affirmative. Therefore, we do not resolve the dispute between the parties as to whether Manuel Lucio breached a duty to disclose defects in the Eighty South Jackson Street Condominium building common areas.

We conclude that jury instruction 15, particularly when read with jury instruction 8, sufficiently informed the jury that any duty to disclose known defects extended to flaws in common areas. Instruction 8 introduced the jurors to the concept that the property sold with a condominium unit includes the owner's share in the common areas:

> In a condominium, owners hold a vested and undivided interest in the common elements. Any sale of a condominium unit includes both the transfer of the owner's interest in the subject unit, together with the owner's undivided interest in the common elements.

CP at 3995. Instruction 15 described the complaint against Manuel Lucio for negligent misrepresentation as including both affirmative statements and omissions. The instruction went on to read that both forms of misrepresentation extended to the subject matter of "the condition of unit 405 *and* the Eighty South Jackson Condominium building." CP at 4003-04. The instruction distinguished between the individual unit and portions of the building in which Lucio held a common interest.

We review the legal accuracy of jury instructions de novo. *Gerlach v. Cove Apartments, LLC*, 196 Wn.2d 111, 127, 471 P.3d 181 (2020). And we review a decision not to issue a jury instruction for abuse of discretion. *Rekhter v. Department of Social & Health Services*, 180 Wn.2d 102, 120, 323 P.3d 1036 (2014). When this court reviews jury instructions, we look to the jury instructions as a whole, with the primary purpose of allowing both parties to fairly state their case. *Rekhter v. Department of Social & Health Services*, 180 Wn.2d 102, 120 (2014). Jury instructions suffice if counsel may argue the client's theory of the case, are not misleading, and, when read as a whole, properly inform the trier of fact of the applicable law. *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996). Jury instructions 8 and 15 allowed Parisien to argue that Manuel Lucio breached his seller duties by failing to fully disclose problems with the condominium building roof.

The superior court may have declined to deliver Suzanne Parisien's proposed jury instruction 17 because she attached a blank Form 17 to the instruction. We need not address whether the superior court abused its discretion by refusing the instruction on this ground. The superior court did not otherwise abuse its discretion in instructing the jury because instructions 8 and 15 already allowed Parisien to argue her theory of liability against Manuel Lucio.

### Attorney Fees

Manuel Lucio requests this court to grant him reasonable attorney fees and costs on appeal based on the attorney fees clause in the purchase and sale agreement. One

sentence in the agreement entitles the prevailing party in a lawsuit between the buyer and

seller to attorney fees:

> However, if Buyer or Seller institutes suit against the other concerning this Agreement the prevailing party is entitled to reasonable attorneys' fees and expenses.

CP at 104.

Washington state follows the American rule that the court should award fees,

expenses, and costs to a prevailing party when permitted by statute, under a contractual

provision, or recognized grounds in equity. *Rorvig v. Douglas*, 123 Wn.2d 854, 861, 873

P.2d 492 (1994). Although Suzanne Parisien's primary claims of misrepresentation

sounded in tort, the claims arose from the parties' contract and Parisien also sued in

contract. In *Brooks v. Nord*, 16 Wn. App.2d 441, 449, 480 P.3d 1167 (2021), the court

awarded fees based on a real estate contract on a claim of negligent misrepresentation

claims allegedly found in Form 17.

We award reasonable attorney fees and costs to Manuel Lucio on appeal against

Suzanne Parisien. We direct our court commissioner to determine a reasonable amount

for an award if Lucio follows the dictates of RAP 18.1.

## CONCLUSIONS

We enter the following rulings:

(1) We affirm the summary judgment dismissal of Suzanne Parisien's claim

against Eighty South Jackson Condominium Association and the board members for

alleged maintenance of an inadequate reserve account and for alleged failure to disclose the lack of a current reserve study.

(2) We reverse the summary judgment dismissal of Suzanne Parisien's claim against the condominium association and board members for purportedly issuing a false and incomplete resale certificate to the extent that the certificate mentioned no building code violations.

(3) We affirm the summary judgment dismissal of Suzanne Parisien's claim against the condominium association and board members for purportedly issuing a false and incomplete resale certificate to the extent that the certificate failed to warn her about the association's lack of a current reserve study and omitted to caution her about the risks associated with the lack of a current reserve study.

(4) We reverse the summary judgment dismissal of Suzanne Parisien's claim against the condominium association and board members for an alleged failure to maintain, repair, and replace the leaky roof and unprotected scupper.

(5) We enter no ruling regarding the merits of a claim brought by Suzanne Parisien, for the first time on appeal, that the condominium association breached a promise, allegedly made after November 3, 2020, to repair Parisien's condominium unit. The superior court never addressed such a claim, and the parties never litigated such a claim before the superior court. We issue no ruling as to whether Parisien may amend her complaint on remand from this court. Assuming Parisien moves to amend her

complaint, the superior court should exercise its discretion under CR 15 as to whether to grant any amendment.

(10) We reverse the summary judgment dismissal of Suzanne Parisien's negligence claim against her real estate broker, Stephanie Susen.

(11) We affirm the summary judgment dismissal of Suzanne Parisien's claim under the consumer protection act against broker Stephanie Susen.

(12) We affirm the jury verdict and judgment in favor of Manuel Lucio. We grant Lucio an award of reasonable attorney fees and costs on appeal against Suzanne Parisien.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.